1
2
3
4
5

DAVID A. ROSENBERG
Nevada Bar No. 10738
U.S. BANKRUPTCY TRUSTEE
5030 Paradise Rd., #B-215
Las Vegas, Nevada 89119
Telephone: (702) 405-7312
darosenberg@7trustee.net

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. BK-S-10-20779-BAM |
| GREGORY, STEVEN TAYLOR<br><br>Debtor. | **MOTION FOR AN ORDER: (1) SELLING REAL PROPERTY FREE AND CLEAR OF INTERESTS AND LIENS; (2) APPROVING SALE TERMS IN THE RPA, HUD, AND MOTION; (3) EMPLOYING BROKER *NUNC PRO TUNC*; (4) APPROVING THE BROKER COMMISSION AND § 506(c) CARVE-OUT; (5) FINDING PURCHASER IN GOOD-FAITH UNDER § 363(m); AND (6) WAIVING THE 14 DAY STAY REQUIRED BY RULE 6004(h)** [283 Pear Meadow Street, Henderson, NV 89012] |
| | Date of Hearing:  February 14, 2012<br>Time of Hearing:  2:30 p.m.<br>Location:  Foley Federal Building, Third Floor<br>Judge:  Hon. Bruce Markell |

David A. Rosenberg, the chapter 7 trustee ("Trustee") for the bankruptcy estate ("Estate") of Steven Taylor Gregory ("Debtor"), files this **MOTION FOR AN ORDER: (1) SELLING REAL PROPERTY FREE AND CLEAR OF INTERESTS AND LIENS; (2) APPROVING SALE TERMS IN THE RPA, HUD, AND MOTION; (3) EMPLOYING BROKER *NUNC PRO TUNC*; (4) APPROVING THE BROKER COMMISSION AND § 506(c) CARVE-OUT; (5) FINDING PURCHASER IN GOOD-FAITH UNDER § 363(m); AND (6) WAIVING THE 14 DAY STAY REQUIRED BY RULE 6004(h)** [283 Pear Meadow Street, Henderson, NV 89012] ("Motion") pursuant to §§ 363(b), (f), 105, and 506(c) of Title 11 of the United States Code ("Bankruptcy Code") and 2002 and 6004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").  This Motion is supported by the Memorandum of Points and Authorities, Exhibits, Declarations, and all arguments entertained. The Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION** ...................................................................................................... 1

**II.   FACTUAL BACKGROUND** ..................................................................................... 1

    **A.   Debtor's Bankruptcy Petition** ....................................................................... 1

    **B.   The Real Property** ............................................................................................ 1

    **C.   Interests and Liens On The Property** ............................................................ 2

    **D.   Debtor's Post-Bankruptcy Experience** ........................................................ 2

**III.  THE PROPOSED SALE** ........................................................................................... 4

    **A.   Overview** .......................................................................................................... 4

    **B.   Value And Marketing Of The Property Before Filing This Motion** ......... 4

    **C.   Distribution Of Net Proceeds Through A Separate, Subsequent Court Order** 5

    **D.   Filing Proofs Of Claims And Objections To Proposed Distribution** ........ 5

    **E.   Additional Terms Of Sale** .............................................................................. 6

        *1.   Substitution Of Buyer Clause* .................................................................. 6

        *2.   The § 506(c) Carve-out For § 363 Compensation Of Trustee* .............. 6

        *3.   Creditors Will Be Adequately Protected* ............................................... 7

        *4.   Credit Bidding By Secured Creditors* ..................................................... 7

        *5.   Adequate Notice Of The Sale Is Proposed* ............................................ 7

        *6.   Sale Subject To Overbid And Bankruptcy Court Approval* .................. 8

**IV.   LEGAL ARGUMENT** ............................................................................................... 8

    **A.   The Sale Complies With The Trustee's Duties And Powers** ..................... 8

    **B.   Trustee May Sell Property Of The Estate Pursuant To 11 U.S.C. § 363(b)** ... 9

        *The Real Property To Be Sold Is Property Of The Estate* .......................... 9

        *Trustee's Business Justification* ................................................................ 10

        **1. The Sale Benefits The Senior Lienholder** ........................................... 11

        **2. The Sale Benefits The First Junior Lienholder** ................................. 12

        **3. The Sale Benefits The Unsecured Creditors** ...................................... 13

        **4. The Sale Benefits The Debtor** .............................................................. 13

            *The Sale Brings Finality To The Disposition Of The Real Property* .... 13

            *The Sale Allows For A Fresh Start* ......................................................... 14

        **5. Public Policy Supports This Sale** ......................................................... 15

**C.** **The Trustee Is Authorized To Sell Free And Clear Pursuant To 11 U.S.C. § 363(f)** ................................................................................................17

    *1.* *This Sale Free And Clear Is Authorized Pursuant To § 363(f)(2)* ..................17

    *2.* *This Sale Free And Clear Is Authorized Pursuant To § 363(f)(5)* .................21

        ***Clear Channel's Facts And Holding*** ................................................21

        ***Clear Channel Adopts The Narrow View Of § 363(f)(5)*** .....................23

        ***"Clarifying" Clear Channel's Two Part Test For Lien Interests*** .............25

        ***Courts Adopting The Expansive View Misread Jolan To Attack Clear Channel*** ..........................................................................27

        ***The First Prong Of Clear Channel's Test Is Satisfied Here*** ...................28

        ***The Second Prong of Clear Channel's Test Is Satisfied Here*** ................29

        ***The Third Prong Of Clear Channel's Test Is Satisfied Here*** ..................31

        ***The Trustee Has Satisfied All Three Prongs of Clear Channel's Test*** ........31

    *3.* *The Trustee Reserves The Right To Argue §§ 363(f)(1), 363(f)(3) And 363(f)(4)* ..............................................................................31

**D.** **The Court Should Approve Implementation Of The Motion, RPA, And HUD** ................................................................................................31

**E.** **The Court Should Approve Employment Of The Broker** *Nunc Pro Tunc* **And Grant Payment Of The Broker Commission** ..................................33

**F.** **The Court Should Approve And Grant Payment Of The § 506(c) Carve-out** ................................................................................................34

**G.** **Purchaser Should Be Deemed A Good-Faith Purchaser Pursuant To § 363(m)** ................................................................................................37

**H.** **The Court Should Waive the 14 Day Stay Required By Bankruptcy Rule 6004(h)** ................................................................................38

**V.** **CONCLUSION** ................................................................................................38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>TABLE OF AUTHORITIES</u>**

**CASES**

*In re 240 North Brand Partners, Ltd.*, 200 B.R. 653, 659 (9th Cir. BAP 1996) ...............10

*In re AFI Holding, Inc.*, 530 F.3d 832, 845 (9th Cir. 2008) ......................................8

*In re AgriBioTech, Inc.*, 319 B.R. 207, 211 (D. Nev. 2004) .....................................8

*In re Ames*, 447 B.R. 680, 683 (Bankr. Mass. 2011) ..........................................20

*In re Anderson*, 66 B.R. 97 (9th Cir. BAP 1986) ........................................34, 35

*In re Atkins*, 69 B.R. 970, 974 (9th Cir. 1995) ............................................33

*In re B&B Autotransfusion Services, Inc.*, 443 B.R. 543 (Bankr. D. Idaho 2011) ...............34

*In re Beaty*, 306 F.3d 914, 922 (9th Cir. 2002) ...........................................19

*Berilo v. HSBC Mortg. Corp., USA*, No. 2:09-cv-02353-RLH-PAL,
2010 WL 26667218, *3 (D. Nev. 2010) .................................................32

*In re Black Bull Run Development, LLC*, No. 10-60593, Dkt. No. 247, *9
(Bankr. D. Mont. Jan. 20, 2011) ....................................................26

*In re Blixseth*, 2011 WL 1519914 (Bankr. D. Mont. Apr. 20, 2011) .......................13, 33

*In re Bolden*, 327 B.R. 657, 668 (Bankr. C.D. Cal. 2005) ..................................36

*In re Boston Generating, LLC*, 440 B.R. 302 (Bankr. S.D.N.Y. 2010) ....................27, 28

*Butner v. United States*, 440 U.S. 48, 54-55 (1979) ........................................9

*In re Canning*, 442 B.R. 165 (Bankr. D. Me. 2011) .....................................15, 20

*In re Canonigo*, 276 B.R. 257, 262-263 (Bankr. N.D. Cal. 2002) .............................9

*In re Cascade Hydraulics & Utility Svc., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) ...............35

*Catalano v. Comm'r of Internal Revenue*, 279 F.3d 682, 685-87 (9th Cir. 2002) ...............9

*Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW, LLC*), 391 B.R. 25 (9th Cir. BAP 2008)
..................................................................................*passim*

*In re Cloobeck*, Case No. 2:10-cv-01278-GMN-PAL,
2011 WL 2550622 *5 (Bankr. D. Nev. 2011) ............................................39

*Chavez v. California Reconveyance Co.*, Case No. 2:10-cv-00325-RLH-LRL,
2010 WL 2545006, *2 (D. Nev. 2010) ..................................................32

*In re Choo*, 273 B.R. 608, 613 (9th Cir. BAP 2002) .......................................36

*In re Colarusso*, 280 B.R. 548, 559-560 (Bankr. Mass. 2002) ...........................18, 19

*In re Compton Impressions Ltd.*, 217 F.3d 1256 (9th Cir. 2000) ..........................35, 37

*In re Daufuskie Island Props., LLC*, 431 B.R. 626, 637 (Bankr. D. S.C. 2010) ...............17

*In re DBSD North America, Inc.*, 634 F.3d 79 (2nd Cir. 2011) ...............................................36

*In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061 (9th Cir. 2001)...................34-36

*In re East Airport Development, LLC*, 443 B.R. 823 (9th Cir. BAP 2011) ......................8, 18, 21, 25

*In re Elliot*, 94 B.R. 343, 345-46 (Bankr. E.D. Pa. 1988) ......................................... 18

*In re Ellis*, 2011 WL 61378, *3 (Bankr. D. Idaho 2011) ......................................... 30

*In re EnvisioNet Computer Servs., Inc*, 275 B.R. 664, 669 (D. Me. 2002) ..................... 19

*In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir. 1974).................. 10

*Evans v. Aurora Loan Services, LLC*, Case No. 2:09-cv-02401-RLH-LRL,

2010 WL 2545639, *3 (D. Nev. 2010)........................................................................32

*In re Fin. Corp. of Am.*, 114 B.R. 221, 223 (9th Cir. BAP 1990) ............................. 34

*In re Fitzgerald*, 428 B.R. 872, 880 (9th Cir. BAP 2010) ..................................... 10

*In re Foster*, 435 B.R. 650, 657-59, 661 (9th Cir. BAP 2010)................................. 20

*FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) ..................... 17

*In re Gulf Coast Oil Corp.*, 404 B.R. 407, 421-427 (Bankr. S.D. Tex. 2009) .............28

*In re Gulf States Steel*, 285 B.R. 497 (Bank. D. Ala. 2002)........................12, 23, 24, 26

*Hamm v. Arrowcreek Homeowners' Ass'n*, 124 Nev. 290, 183 P.3d 895 (2008) ...14, 30

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000) .....35

*In re Haskell, L.P.*, 321 B.R. 1, 9 (Bankr. D. Mass 2005) ..................................... 23

*In re Herter*, 456 B.R. 455, 469-471 (Bankr. D. Idaho 2011) ................................. 9

*In re Hyman*, 123 B.R. 342, 348 (9th Cir. BAP 1991) ......................................... 9

*In re Intermagnetics Am., Inc.*, 926 F.2d 912, 915-17 (9th Cir. 1991) ..................... 6

*In re Jenkins*, 130 F.3d 1335 (9th Cir. 1997) ................................................... 34

*In re JL Building, LLC*, 452 B.R. 854, 861 (Bankr. D. Utah 2011).............................5

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) .................34

*In re Jolan, Inc.*, 403 B.R. 866 (Bankr. W.D. Wash. 2009) ...........................7, 25-28, 30

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975) .........................34

*In re Lashbrook*, Case No. 09-00484-HAR, Dkt. No. 184, *4

(Bankr. D. Alaska June 3, 2011) ....................................................................... 35

*Latman v. Burdette*, 366 F.3d 774, 784 (9th Cir. 2004) .........................................8

*Leyva v. National Defense Servicing Corp.*, 127 Nev. ___, 255 P.3d 1275 (2011) .........32

*Local Loan Co. v. Hunt*, 292 U.S. 234 (1934) ............................................... 15, 19

*In re Loloee*, 241 B.R. 655, 662 (9th Cir. BAP 1999) ......................................... 18

*In re Lopez*, 283 B.R. 22, 31-32 (9th Cir. BAP 2002) .............................................9

*In re M Capital Corp.*, 290 B.R. 743, 747 (9th Cir. BAP 2003) ............................................ 37

*In re Mama's Original Foods, Inc.*, 234 B.R. 500, 503 (Bankr. C.D. Cal. 1999) ..................... 31

*In re Marino*, 794 F.2d 1367, 1370 (9th Cir. 1986) ............................................................. 35

*In re Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1381 (9th Cir. 1985) ........................... 5

*In re McCombs*, 436 BR 421 (Bankr. S.D. Tex. 2010) ....................................................34-37

*In re McKinney*, 383 B.R. 490, 493-494 (Bankr. N.D. Cal. 2008) ........................................35

*In re Metzger*, 346 B.R. 806, 815 (Bankr. N.D. Cal. 2006) ................................................18

*In re Miell*, 439 B.R. 704, 707-710 (8th Cir. BAP 2010) ..................................................... 8

*Morgan v. K.C. Mach. & Tool Co.*, 816 F.2d 238, 241 (6th Cir. 1987) ...............................18

*In re New Power Co.*, 438 F. 3d 1113, 1117-18 (11th Cir. 2006) ..........................................6

*In re Pauline*, 119 B.R. 727, 728 (9th Cir. BAP 1990) .......................................................36

*In re Pioneer Village Investments, LLC.*, Case No. 10-62851, Dkt. No. 110

(Bankr. D. Or. Dec. 3, 2010)..............................................................................................27

*Pepper v. Litton*, 308 U.S. 295, 304 (1939) .....................................................................19

*In re Popp*, 323 B.R. 260, 266 (9th Cir. BAP 2005) ...........................................................9

*In re Pruitt*, 319 B.R. 636, 638 (Bankr. S.D. Cal. 2004) ....................................................34

*In re Rigden*, 795 F.2d 727, 730-31 (9th Cir. 1986) .......................................................... 8

*In re Roberts*, 249 B.R. 152, 159 (Bankr. W.D. Mich. 2000) ............................................. 18

*In re Roderick Timber Co.*, 185 B.R. 601 (9th Cir. BAP 1995) ........................................... 34

*In re Santos*, 112 B.R. 1001, 1006 (9th Cir. BAP 1990) ................................................... 19

*In re Saxman*, 325 F.3d 1168, 1175 (9th Cir. 2003) ........................................................ 19

*In re Scott*, Case No. 10-69733, Dkt. No. 76, *4

(Bankr. E.D. Mich. June 29, 2011) .................................................................................. 27

*Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005) ..................... 15

*In re Sheryl Lynn Pigg*, 453 B.R. 728 (Bankr. M.D. Tenn. 2011) .......................................20

*In re Shirley*, 134 B.R. 940, 943-44 (9th Cir. BAP 1992) ................................................. 33

*In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993) .......................................................36

*In re Sunflower Racing, Inc.*, 219 B.R. 587, 600 (Bankr. D. Kan. 1998) ............................12

*In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D. N.J. 1994) ............................................17

*In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821 (N.D. Ill. 1993)............................22-24

*In re Thirteen South v. Summit Village*, 109 Nev. 1218, 866 P.2d 257 (1993) ..................... 4

*In re Thomas*, 287 B.R. 782, 785 (9th Cir. BAP 2002) .....................................................37

*United States v. Sutton*, 768 F.2d 1305, 1308 (5th Cir. 1986) ..........................................19

*In re Veal*, 449 B.R. 542 (9th Cir. BAP 2011) .................................................................. 32

*Veltman v. Whetzal*, 93 F.3d 517, 521 (8th Cir. 1996) ...................................................... 19

*In re Virissimo*, 354 B.R. 284 (Bankr. D. Nev. 2006) ....................................................... 34

*In re Warren*, 2011 WL 3299819, *5, n. 4 (9th Cir. BAP 2011) ....................................... 36

*In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991)............. 10

*In re Wrangell Seafoods, Inc.*, Case No. 09-00012, Dkt. No. 116

(Bankr. D. Alaska March 9, 2009) .................................................................................... 28

### STATUTES

*Federal*

11 U.S.C. § 105, (a) .................................................................................. 18, 19, 21, 39

11 U.S.C. § 323, (a) ........................................................................................................ 8

11 U.S.C. § 326, (a) ........................................................................................... 34-37, 67

11 U.S.C. § 327, (a) ................................................................................................... 33, 34

11 U.S.C. § 330, (a), (a)(1), (a)(7) ......................................................................... 6, 34, 35

11 U.S.C. § 331 ............................................................................................................... 6

11 U.S.C. § 361 ............................................................................................................. 16

11 U.S.C. § 362 .......................................................................................................... 2, 16

11 U.S.C. § 363, (b), (e), (f)(1-5), (k), (m) ......................... 4, 6-10, 12, 13, 16-28, 30-33, 35-39

11 U.S.C. § 364 ............................................................................................................. 16

11 U.S.C. § 502, (b)(2), (b)(6), (b)(7) ........................................................................... 15

11 U.S.C. § 506, (a), (c) ........................................... 4, 6, 7, 13, 23, 30, 32, 34-37, 39

11 U.S.C. § 507, (a) ...................................................................................................... 15

11 U.S.C. § 510, (b), (c) ............................................................................................... 15

11 U.S.C. § 521, (a)(2) ................................................................................................. 20

11 U.S.C. § 522 .............................................................................................................. 9

11 U.S.C. § 523, (a)(16) ............................................................................................... 20

11 U.S.C. § 524, (a), ..................................................................................................... 15

11 U.S.C. § 541, (a)(1) ................................................................................................... 9

11 U.S.C. § 554, (a), (b), (c), (d) ............................................................................... 9, 10

11 U.S.C. § 704 .......................................................................................................... 8, 10

11 U.S.C. § 724, (a), (b) ............................................................................................... 15

11 U.S.C. § 1114 ........................................................................................................... 14

11 U.S.C. § 1129, (b)................................................................16, 22, 23, 25, 27

11 U.S.C. § 1322, (b)(2)................................................................................27

26 U.S.C. §§ 6335, 6339(c), 6342..................................................................29

**Nevada**

NRS § 40.430...........................................................................................29, 32

NRS § 40.462...................................................................................................32

NRS § 78.700...................................................................................................28

NRS § 107.030.................................................................................................32

NRS § 107.080...........................................................................................29, 32

NRS § 116.3116, (1), (2), (4)....................................................................29, 30

NRS § 116.31162.............................................................................................30

NRS § 116.31164, (1), (3)(c)..........................................................................29

NRS § 116.31168.............................................................................................30

NRS § 116.310312...........................................................................................29

NRS §§ 148.130, 148.140...............................................................................28

NRS §§ 361.585, 361.595, 361.610................................................................28

NRS § 649.020.................................................................................................30

**RULES**

Fed. R. Bank. P. 2002.................................................................................8, 39

Fed. R. Bank. P. 2014, (a)...............................................................................33

Fed. R. Bank. P. 3001, (e)(2)...........................................................................22

Fed. R. Bank. P. 3019, (a)..................................................................................6

Fed. R. Bank. P. 6004, (h)....................................................................8, 38, 39

Fed. R. Bank. P. 9024........................................................................................9

Fed. R. Civ. P 60(b)...........................................................................................6

**OTHER SOURCES**

Cutts, Amy Crews, and Richard K. Green. *Innovative Servicing Technology: Smart Enough to Keep People in Their Houses? Freddie Mac Working Paper No. 04–03*. Washington, DC: Freddie Mac (2004) available at

http://www.freddiemac.com/news/pdf/fmwp_0403_servicing.pdf................12

Bussel, Daniel J. & Kenneth N. Klee. *Recalibrating Consent In Bankruptcy*, 83 AM. BANKR. L.J. 663, 669 (2009) ..................................................................16, 19

Goldmintz, Daniel, *Lien Priorities: The Defects of Limiting the "Super Priority" for Common Interest Communities*, 33:2 Cardoza L. Rev. 101-129 (2011) .....................................29

Hicks, Jonathon. *Foxes Guarding the Henhouse:'The Modern Best Interests of Creditors' Test in Chapter 11 Reorganizations*, 5 NEV. L.J.  820, 837-38 (2005) .......................13

Johnson, Creola. *Fight Blight: Cities Sue to Hold Lenders Responsible for the Rise in Foreclosures and Abandoned Properties*, 2008 UTAH L. REV. 1169, 1186 (2008) ..................................................................................................................................11

Lawless, Robert M. et al. Did *Bankruptcy Reform Fail? An Empirical Study of Consumer Debtors*, 82 AM. BANKR. L.J. 349, 376, 381 (2008) .................................................14

Mortgage Bankers Ass'n, "*Lenders' Cost of Foreclosure*" p. 2 (May 2008), available at http://www.mbaa.org/files/Advocacy/2008/LendersCostofForeclosure...........................12

Perkins, Casey. *Privatopia in Distress: The Impact of the Foreclosure Crisis on Homeowners' Associations*, Note, 10 Nev. L. J. 561 (2010) .....................................11

U.S. Congress, Senate Joint Economic Committee. *Sheltering Neighborhoods from the Subprime Foreclosure Storm*, Special report by the Joint Economic Committee, 1, 110th Cong., 1st sess. (Washington: GPO 2007) http://jec.senate.gov/archive/Documents/Reports/subprime11apr2007revised.pdf ..................................................................................................................................12

Wilson, James Q. and George L. Kelling "Broken Windows: The Police and Neighborhood Safety." *The Atlantic*. March 1982: 29-38.....................................................................11

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

In the aftermath of the subprime mortgage meltdown, debtors have been forced to change the way they view homeownership.  Once considered debtors' most valuable asset, their homes have been transformed into burdensome liabilities.  Debtors unable to maintain their mortgage payments remain in default after bankruptcy and still face imminent foreclosure and eviction.  While foreclosure obviously impacts debtors and creates substantial losses for secured creditors, this inefficient outcome also imposes significant costs on third parties, especially neighboring homeowners.  Besides depressing property values and tax revenue, pre and post-foreclosure homes become a hazard to the health, morals, and safety of a community.  Making matters worse, homeowners associations charged with preventing irreversible damage to the surrounding neighborhood now find their member and assessment bases decimated by this foreclosure spiral, leaving them without resources to employ their state law remedies to hold secured creditors accountable for maintenance and upkeep of properties surrendered by debtors in bankruptcy.  Powerless to collect, homeowners associations have now approached the Trustee about using a bankruptcy sale to obtain immediate relief—for their communities, for debtors seeking a fresh start, and for secured creditors desiring a stabile housing market to optimally liquidate collateral.[1]

## II.  FACTUAL BACKGROUND

### A.    Debtor's Bankruptcy Petition

On June 10, 2010, Debtor filed a voluntary chapter 7 petition ("Petition") in the United States Bankruptcy Court, District of Nevada [Dkt. No. 1].  On June 10, 2010, David A. Rosenberg was appointed Trustee for the Debtor's Estate [Dkt. No. 6].

### B.    The Real Property

Debtor's Petition valued his former principal residence—the real property located at 283 Pear Meadow Street, Henderson, NV 89012 ("Property")—at $155,000 [Dkt. No. 1, Schedule D].

---

[1] Throughout this Motion, the Trustee will use the words "bank", "lender", "secured creditor", and "servicer" interchangeably.  These words are meant to describe parties in interest who have a security interest in a debtor's real property or entities charged by those parties in interest with servicing the loan and exploring loss mitigation options.

**C.    Interests And Liens On The Property**

In order of priority, the parties with liens ("Lienholders") encumbering the Property are: (1) two homeowners associations (hereafter, the "Association" or "HOA" or "Senior Lienholder"), which hold "super priority" liens in the amounts of $17,390 and $1,488 (*See* Ex. 1); and (2) Wells Fargo Bank, N.A. dba America's Servicing Company (hereafter the "First Junior Lienholder"), which holds an outstanding first mortgage for $265,399 (*See* § 362 Information Sheet, Dkt. No. 10).

**D.    Debtor's Post-Bankruptcy Experience**

On June 23, 2010, the First Junior Lienholder filed a Motion for Relief from the Automatic Stay ("MLS"); the MLS estimated the First Junior Lienholder's "Cost of Sale" at $12,400 [Dkt. No. 10].  Two days later, on June 25, 2010, the Debtor attempted to retrieve personal belongings from the Property but was unable to gain access; the First Junior Lienholder had already changed the locks. *See* Declaration of Stephen Gregory.  On August 17, 2010, almost two full months after the First Junior Lienholder took exclusive possession of the Property in defiance of the automatic stay, the Order granting the MLS was entered [Dkt. No. 25].  On August 25, 2011, over a year after the MLS was granted so the First Junior Lienholder could foreclose on the Property, the Debtor contacted the Trustee, sending a letter to explain the Debtor's current circumstances and ascertain whether the Trustee—who is still appointed because the Estate remains open—could provide him with a solution ("Gregory Letter"). *See* Ex. 2.

According to the Gregory Letter, the Debtor willingly vacated the Property shortly before seeking bankruptcy protection. *Id*.  Aside from one unsuccessful attempt to retrieve some remaining personal belongings, the Debtor has not been back to the Property or attempted to regain possession since filing. *Id*.  Instead, the Debtor has focused his energies on earning a living, rebuilding his credit, and making the most of his fresh start. *Id*.  It was his reasonable belief, reinforced by this Court granting the MLS, that the maintenance, carrying costs, and disposition of the Property (a home which the Debtor alleges was left in pristine condition) were now the responsibility of the First Junior Lienholder. *Id*.  While the Debtor did still occasionally receive notices from the HOA of delinquent fees and problems to correct, he assumed this was a clerical error which would eventually get resolved once the HOA realized that the First Junior Lienholder was in control of the Property (or, at the latest, once the Property was foreclosed). *Id*.

On or around July 11, 2011, over a year after the First Junior Lienholder took physical possession of the Property, the Debtor finally decided to investigate why he was still receiving

- 2 -

mail from the HOA; he contacted the HOA to correct the record once and for all. *Id.*  To his astonishment, the Debtor learned that the Property was still titled in his name, and—despite the First Junior Lienholder aggressively lifting stay and forcibly retaking the Property—he was still legally responsible under Nevada law. *Id.*  Worse, when the Debtor went back to see his former home, he found it grossly neglected, an eyesore dragging down neighborhood property values. *Id.* Confronted with this indisputable evidence of the First Junior Lienholder's inaction, the Debtor next sought out the help of a realtor to remove him from title. *Id.*  To his surprise, the realtor indicated that the Debtor had no legal remedy to force the First Junior Lienholder to foreclose on its collateral or take title through a deed-in-lieu. *Id.*  If the Debtor wanted to finally be free and escape further liability for the Property, his only option was to actively facilitate a "short sale." *Id.*

On or about July 25, 2011, Debtor contacted Lisa Lundt of Universal Realty, Inc. ("Broker") regarding the possibility of her handling his "short sale"; the Broker agreed to list and market the Property. *Id.*  Because the Debtor had been locked out of the Property for over a year, the Broker contacted the First Junior Lienholder directly to request access to the Property; it provided her with the keys. *See* Declaration of Lisa Lundt.  The Broker then listed the Property and quickly found a buyer. *Id.*  On August 3, 2011, the buyer presented the Broker with a signed offer for $117,000. *Id.*  On August 4, 2011, the Broker submitted a Short Sale Worksheet, which detailed the offer's terms, to the First Junior Lienholder ("Short Sale Offer").  *Id.*; *see also* Ex. 3.

On August 22, 2011, the Debtor received a letter from the First Junior Lienholder dated August 19, 2011, which he assumed was a response to the Short Sale Offer. *See* Gregory Declaration. To his surprise, the letter made no mention of a "short sale" and failed to acknowledge that the First Junior Lienholder had ever received the Short Sale Offer; instead, it referenced "mortgage assistance" ("Mortgage Assistance Letter"). *See* Ex. 4.  Confused, the Debtor contacted the First Junior Lienholder about the Short Sale Offer; he was told that his "short sale" was on permanent hold—apparently, because his bankruptcy case was still open. *See* Gregory Declaration. On August 25, 2011, the Debtor explained his plight in the Gregory Letter.[2]

On October 1, 2011, the First Junior Lienholder suddenly changed its mind and issued a response to the Short Sale Offer ("Short Sale Approval Letter"). *See* Ex. 5.  In the Short Sale Approval Letter, the First Junior Lienholder accepted the sale price but only left $714.00 to be allocated for the Association. *Id.*  The Broker informed the Debtor and the Trustee that a "short

---

[2] This was not the first time that the Trustee had been confronted with this problem, and he anticipates it will not be the last.  The Trustee continues to be contacted by both debtors and homeowners associations seeking a solution.

sale" of the Property was not likely given this unreasonable demand.  *See* Lundt Declaration.  The HOA was not amused by this insult and consented to the Trustee filing this Motion and proceeding with a sale of the Property ("Sale").  *See* Rosenberg Declaration.   Accordingly, on October 20, 2011, the Trustee executed a new Listing Agreement with the Broker on behalf of the Estate.  *Id.*; *see also* Ex. 6.  By November 18, 2011, the Trustee had received seven (7) offers on the Property; the highest was for $120,000.  *See* Lundt Declaration.  Given that the First Junior Lienholder previously accepted a purchase price of $117,000 in the Short Sale Approval Letter, the Trustee agreed to accept this superior offer, which he now presents to the Court in the Motion.

### III.  THE PROPOSED SALE

**A.    Overview**

The Trustee seeks to sell the Property to Kristine Korth ("Purchaser") for $120,000 ("Purchase Price") pursuant to the sale terms contained in the Residential Purchase Agreement ("RPA") and in the HUD-1 ("HUD").  *See* Ex. 7.  The Property will be sold "as-is", "where-is", with all faults, without warranty or recourse, but free and clear of all liens and interests—with all proceeds remaining after payment of taxes, fees, Broker Commission, and other ordinary costs of sale ("Net Proceeds") held in trust by the Trustee following Sale.  An order granting this Motion also deems the § 506(c) Carve-out earned at closing and authorizes a release of all liens against the Property, stripping and transferring them to the Net Proceeds to provide adequate protection.  Then, once the Trustee has verified their validity and priority, these claims will be paid at the Court's direction.  In effect, what the Trustee asks this Court to approve is a bankruptcy sale under §§363(b) and (f) structured as a hybrid between a "short sale" and a state law foreclosure sale.

**B.    Value And Marketing Of The Property Before Filing This Motion**

The Broker, employed by the Estate after the Debtor filed bankruptcy, has personally inspected and evaluated the Property, including running comparables to determine its resale value before listing it for $110,000.  *See* Lundt Declaration.  In addition to showing the Property and holding open houses, the Broker helped the Trustee negotiate with potential buyers and make counter-offers, which ultimately lead to a final acceptable agreement (subject to Court approval) on the Purchase Price and terms of the RPA and HUD.  *Id*.  After intensive marketing efforts by the Broker, several parties have shown an interest in purchasing the Property, with the best offer being from the Purchaser.  *Id*.  The Broker believes $120,000 represents current, fair market value for the Property and is an excellent offer, as the Property will almost surely sell for

less if the First Junior Lienholder pursues the alternative, i.e. to foreclose and remarket it for sale. *Id.* The Broker will receive a commission equal to six percent (6%) of the Purchase Price ("Broker Commission"), which will be split with Purchaser's agent. Additionally, the Purchase Price is subject to higher and better offers submitted at the hearing on this Motion ("Hearing").

**C.    Distribution Of Net Proceeds Through A Separate, Subsequent Court Order**

Following approval of the Sale and payment of the Purchase Price by the Purchaser, the escrow agent/title company will disburse from the Purchase Price all monies provided for in the HUD, including paying the Broker Commission and all taxes, expenses, and costs associated with the Sale. The Net Proceeds will then be disbursed directly to the Trustee, to be held in trust by him while he verifies/objects to claims and files a proposed distribution ("Proposed Distribution"). After notice and a hearing, the Court will issue an order finalizing the Proposed Distribution and directing payment by the Trustee in accordance with the terms therein ("Order on Proceeds"). *See In re JL Building, LLC*, 452 B.R. 854, 861 (Bankr. D. Utah 2011)(requiring that all net proceeds from the sale of secured real property be held in escrow by the chapter 7 trustee pending a full investigation of claims and a further order from the court directing disbursement).

**D.    Filing Proofs Of Claims And Objections To Proposed Distribution**

As all liens will attach to the Net Proceeds following the Sale, the Trustee expects that each lienholder will file a proof of claim. In the event that no formal proof of claim is filed, the Trustee will treat any motion to lift stay previously filed by a Lienholder as an informal proof of claim, provided it has adequate documentation attached to it. *See In re Matter of Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1381 (9th Cir.1985)(holding that motions for relief from the automatic stay constitute informal proofs of claim because they "state an explicit demand showing the nature and amount of the claim against the estate, and evidence an intent to hold the debtor liable"). In addition, after the Sale is completed, the Trustee will issue a notice to all Lienholders, informing them of the need to file formal proofs of claim or amend existing claims. Assuming the Trustee can verify that each is an allowed secured claim—and the Trustee has no objections or need to file an adversary to resolve disputes arising from these liens—the Trustee will move forward with the Proposed Distribution and set a hearing to obtain the Order on Proceeds. Should any Lienholder disagree with the amount, priority, or accuracy of claims filed against the Net Proceeds, this hearing will provide a meaningful opportunity to voice objections.

### E.    Additional Terms Of Sale

#### 1.  Substitution Of Buyer Clause

The Trustee has included a provision in the Motion which allows the Trustee to assign the Purchaser's purchase rights under the RPA and HUD to a substitute buyer ("Substitute Buyer").[3]   The Substitute Buyer may then exercise those purchase rights and, like a back-up bidder, close escrow on the Property without the need for the Trustee to seek Court approval for what is substantially the same Sale ("Substitution of Buyer Clause").[4]   The Trustee can only elect to substitute in a different buyer provided <u>ALL</u> of the following necessary conditions are met:

(i)   The Substitute Buyer signs a notarized affidavit attesting to his disinterestedness.  This attestation document will be filed on the docket as part of the Trustee's Report of Sale.

(ii)  The Substitute Buyer agrees to accept and assume the entire RPA and HUD as if he had negotiated each word himself and had signed them with full knowledge of their contents.

(iii) The Substitute Buyer must <u>guarantee</u> that when the transaction closes, the Estate will receive the same Net Proceeds under the HUD as it would have if the Purchaser had closed the Sale.  The HUD itself may be reworked to allow for any changed conditions since the Sale to the Purchaser was approved by the Court.  All terms may be changed without seeking Court approval, so long as—when everything is said and done—the Estate is paid the same Net Proceeds as was contemplated in the original order.[5]   To provide full disclosure, any new HUD must be included in the Trustee's Report of Sale.

In summary, the Trustee will be allowed to make necessary changes to advance the Sale so long as said changes have no materially adverse effect on the Debtor, the Estate, or the Lienholders.[6]

#### 2.  The § 506(c) Carve-out For § 363 Compensation Of Trustee

Subject to limitations imposed upon compensation set forth in the Bankruptcy Code and Bankruptcy Rules, including 11 U.S.C. §§ 326, 330, and 331, the Trustee will be compensated his reasonable fees, as approved by the Court, in connection with conducting the Sale of

---

[3] This clause is necessary to protect the parties' expectations against contingencies which routinely doom short sales.

[4] The Substitution of Buyer Clause is analogous to how resolicitation of creditors is not required to confirm an otherwise consensual plan that is modified in ways deemed not to be materially adverse to previously consenting creditors. *See* FED. R. BANKR. P. 3019(a); *In re New Power Co.*, 438 F. 3d 1113, 1117-18 (11th Cir. 2006).

[5] This insures that Lienholders are paid no less with a Substitute Buyer than they would receive under the original HUD and RPA approved by the Court.  The § 506(c) Carve-out and Broker Commission will be decreased if needed.

[6] The findings under § 363(m) requested in this Motion would apply equally to the Substitute Buyer.  Nothing in this procedure would limit the Court's power to revisit the original order approving the Sale and vacate, modify, or otherwise grant relief in the event of the Substitute Buyer's lack of good faith or misconduct. *See* Fed. R. Civ. P. 60(b), incorporated by Fed. R. Bankr. P. 9024; *In re Intermagnetics Am., Inc.,* 926 F.2d 912, 915-17 (9th Cir. 1991)(Rule 60 does not limit power to entertain independent action to set aside sale for fraud on the court).

Lienholders' collateral (hereafter "Trustee's § 363 Compensation" or "§ 506(c) Carve-out"). The Trustee's § 363 Compensation will equal the statutory trustee's fee computed under § 326 based upon the full Purchase Price. The Trustee's § 363 Compensation will be paid from the Net Proceeds of the Sale through the § 506(c) Carve-out. After the Sale, the Trustee will make a gift to the Estate of 50% of the Trustee's § 363 Compensation (thereby guaranteeing that half (1/2) of the § 506(c) Carve-out earned by the Trustee goes directly to pay unsecured creditors).[7] Most importantly, while the Trustee may ask the Court for reimbursement of minor expenses (like postage and noticing costs), the Trustee will not "double-dip" by filing an administrative claim for additional compensation under § 326 before proposing a final distribution to creditors.[8]

### 3. Creditors Will Be Adequately Protected

11 U.S.C.A. § 363(e) requires the trustee to furnish adequate protection to the holder of an interest whose property is sold, if timely demanded. The typical form of adequate protection is for liens to attach to the proceeds of the sale to the extent and to the same priority as in the collateral; this Sale should therefore have a priority scheme akin to a foreclosure under Nevada law. Hence, if the Trustee is able to confirm the validity and extent of <u>all</u> liens prior to the Sale (and there are no objections or conflicts, i.e. a stipulated agreement by all parties), the Trustee will consider paying said liens—directly out of escrow—the Net Proceeds remaining after payment of taxes, fees, Brokers Commission, the § 506(c) Carve-out, and other ordinary costs of Sale. If, however, these conditions are not satisfied at the time that escrow closes, then the Trustee shall hold in trust the Net Proceeds pending a later distribution via the Order on Proceeds.

### 4. Credit Bidding By Secured Creditors

Additional protection is also provided here by allowing all secured creditors to credit bid. *See* 11 U.S.C. § 363(k). The Trustee proposes to allow credit bidding by all Lienholders to the full extent of § 363(k), though the § 506(c) Carve-out must be paid in cash and not by credit bid.

### 5. Adequate Notice Of The Sale Is Proposed

The notice requirements for sales outside the ordinary course are set forth in Bankruptcy

---

[7] This compensation structure for selling houses under § 363(f) is modeled after one currently being used by trustees in Washington State (the same Ninth Circuit district that authored *In re Jolan*—*See* discussion of case, Section IV(C)(2) *infra*). Their § 506(c) Carve-out—which uses § 326 as the standard, with 50% guaranteed to benefit unsecured creditors—was originally suggested by one of the judges there and has since been widely adopted by the trustees. *See* Rosenberg Declaration.

[8] The U.S. Trustee has a policy against trustees liquidating assets that are undersecured unless there is some benefit to the estate. The Trustee is very aware of this. *See* Rosenberg Declaration.

Rules 2002 and 6004; *See also In re Miell*, 439 B.R. 704, 707-710 (8th Cir. BAP 2010) (discussing what constitutes adequate notice to secured creditors when a chapter 7 trustee files a motion to sell real estate free and clear of liens).  The Trustee has complied with these requisites by serving, via first class mail, the notice, the Motion, and all related exhibits and declarations on the Lienholders.  Additionally, a copy of the notice has been served on the entire Creditor Matrix, either by CM/ECF to parties authorized to receive electronic noticing or by first class mail to parties not so authorized.  The Trustee hereby submits that no further notice is necessary.

### 6.  Sale Subject To Overbid And Bankruptcy Court Approval

The Sale is subject to overbid at the Hearing and bankruptcy court approval.

## IV.  LEGAL ARGUMENT

The Trustee believes that the Sale complies with his duties and powers under § 704.  The Sale can be authorized under § 363(b) because the Property has not been sold, abandoned, or exempted—and is, therefore, still property of the Estate—and there is a business justification for the Trustee selling the Property.  Additionally, under *In re East Airport Development LLC*, 443 B.R. 823 (9th Cir. BAP 2011) and *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (9th Cir. BAP 2008), the Sale free and clear of liens, interests, and encumbrances is proper and meets the requirements set forth in §§ 363(f)(2) and 363(f)(5).

### A.    The Sale Complies With The Trustee's Duties And Powers

A chapter 7 trustee serves as the official representative of the estate. 11 U.S.C. § 323(a). A chapter 7 trustee has a legal duty to liquidate assets of the estate. 11 U.S.C. § 704; *In re AFI Holding, Inc.*, 530 F.3d 832, 845 (9th Cir. 2008).  In performance of his duties under § 704, the Trustee also has a fiduciary duty to all creditors of the estate to protect their interests against dissipation of any assets. *In re Rigden*, 795 F.2d 727, 730-31 (9th Cir. 1986)(noting bankruptcy trustee has "a fiduciary obligation to conserve the assets of the estate and to maximize distribution to creditors"); *In re AgriBioTech, Inc.*, 319 B.R. 207, 211 (D. Nev. 2004)(trustee's job is to "marshall all of the estate's property for the estate's benefit").  To that end, a trustee is vested with significant powers, including the right to bring a sale under 11 U.S.C. § 363(b).[9] *Id.*

---

[9] "The Bankruptcy Code directs trustees to pursue all available remedies to protect the value of the bankruptcy estate for creditors. *See* 11 U.S.C. § 704." *Latman v. Burdette,* 366 F.3d 774, 784 (9th Cir. 2004).

**B.      Trustee May Sell Property Of The Estate Pursuant To 11 U.S.C. § 363(b)**

A trustee may only "use, sell, or lease" property outside the ordinary course of business "after notice and a hearing." § 363(b).  A trustee may even sell overencumbered property when to do so would benefit the estate, with the caveats that the sale must be based on § 363(b) and the buyer must take title subject to the full face amount of the secured claims on the property.  *In re Canonigo*, 276 B.R. 257, 262-263 (Bankr. N.D. Cal. 2002).  Implicit within the statutory grant of authority to sell property under section 363(b) is the absolute requirement that the estate actually have an interest in the property to be sold.  *In re Popp,* 323 B.R. 260, 266 (9th Cir. BAP 2005).

***The Real Property To Be Sold Is Property Of The Estate***

To gain approval under § 363(b), the trustee must first demonstrate that the real property to be sold is "property of the estate." *Id.* at 268.  The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  Once the bankruptcy petition has been filed, any property right belonging to a debtor under state law becomes an asset of the estate. *Butner v. United States,* 440 U.S. 48, 54-55 (1979).  Real property remains "property of the estate" until it has been exempted by the debtor under § 522, abandoned under § 554, or sold under § 363.  *In re Lopez,* 283 B.R. 22, 31-32 (9th Cir. BAP 2002).  If real property is scheduled and not claimed exempt, sold, or abandoned by the trustee, it is abandoned to the debtor at the time the case is closed. *Id.*; § 554(c).  Title is, therefore, in the trustee from the beginning and, unless real property is abandoned or intentionally revested, title will stay in the trustee.  *In re Hyman*, 123 B.R. 342, 348 (9th Cir. BAP 1991), *aff'd*, 967 F.2d 1316 (9th Cir. 1992).

Even where the automatic stay has been lifted as to a secured creditor, the bankruptcy estate still retains an interest in the property. *Catalano v. Comm'r of Internal Revenue*, 279 F.3d 682, 686-687 (9th Cir. 2002)("[A]n order lifting the automatic stay by itself does not release the estate's interest in the property and 'the act of lifting the automatic stay is not analogous to an abandonment of the property.'").  An order lifting the automatic stay does not remove property from the bankruptcy estate; it merely removes an injunction barring creditors from bringing suit against the debtor or the debtor's property. *Id.*  Absent a formal order of abandonment contained within the order granting relief from the stay, abandonment is not accomplished under § 554(d). *Id* at 687; *see also In re Herter*, 456 B.R. 455, 469-471(Bankr. D. Idaho 2011)(chapter 7 trustee's earlier decision not to object to a secured creditor's motion for relief from the automatic

stay does not abandon estate property and should not later be used to estop or prevent the trustee, where a case remains active and open, from selling that property to fulfill his duty to maximize recovery for unsecured creditors).

The Property here has not been exempted, sold, or abandoned by the Trustee, and the case remains open.  Similarly, the motion and order lifting stay do not mention abandonment or § 554 [Dkt. Nos. 10 and 25, respectively].  The Property, therefore, remains property of the estate.

### *Trustee's Business Justification*

Next, the court will examine the trustee's "business justification" for the sale.  *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653, 659 (BAP 9th Cir. 1996).  The court will be guided by an understanding that:

> In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, i.e., it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an "arms-length" transaction.

*In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

Finally, the court may elect to supplement the "business justification" rule with a "best interest" test which authorizes sale when it is in the best interest of the estate.  *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir.), *cert. denied*, 419 U.S. 964 (1974)(where an asset's market value is likely to deteriorate substantially in the near future, a sale is in the estate's best interest).

Here, the Trustee believes his duties and powers under § 704 provide sufficient business justification for the Sale.  Similarly, it is not an abuse of the Court's discretion to authorize this Sale under § 363(b) because: (1) the Sale is fair and reasonable and a proper exercise of the Trustee's business judgment.  *See* Rosenberg Declaration; (2) the Property has been adequately marketed and the Purchase Price offered represents fair market value.  *See* Lundt Declaration; (3) the Sale has been negotiated in good-faith, from arm's length bargaining positions; and (4) the Purchaser is proceeding in good faith and can be determined to be a good faith purchaser under § 363(m).[10]  This Sale also provides maximum benefits to Lienholders, the Debtor, and the Estate—all while furthering important policy considerations underlying the Bankruptcy Code.

---

[10] "While a finding of 'good faith' is not an essential element for approval of a sale under § 363(b), such a determination becomes important with respect to potential mootness when an appeal is taken from the order authorizing the sale."  *In re Fitzgerald*, 428 B.R. 872, 880 (9th Cir. BAP 2010).

- 10 -

**The Sale Benefits The Senior Lienholder**

The Sale provides maximum benefit to the Senior Lienholder by allowing the Association to meet its obligations and timely enforce covenants owed by each homeowner to the community.  Because the Association is charged with, whenever possible, preserving the value of the neighborhood, it cannot ignore the presence of vacant homes and those in foreclosure, which negatively impact local property values and price trends.  Nor can it deny that vacant homes and those in foreclosure should rightfully be seen as a major concern for existing homeowners and prospective buyers, as well as mortgage lenders and servicers operating in the area.  Nevertheless, in spite of these truths, the Association today finds itself without partners.

Both the structure of the modern mortgage market and the tactics routinely employed by lenders make it difficult for the HOA to force lenders to maintain properties.  After financially-strapped borrowers renounce ownership of their homes, lenders show little inclination to take care of properties they obtained via foreclosure or a deed in lieu; rather, the substantial costs of resale, repair, and maintenance drive lenders to dodge responsibility for them.  Lenders know foreclosure is a winless remedy, regardless of who initiates it.[11]  This is doubly true for the Association, which is in no better position presently to absorb these substantial upfront costs.  Additionally, if the HOA elects to aggressively foreclose, it sets in motion a cycle that speeds up member attrition, home vacancy, and community equity loss, which then encourages strategic defaults and more foreclosures, which increasingly results in fewer and fewer paying members funding the Association, which ultimately causes the Association to grow insolvent, delay maintenance, and neglect necessary repairs in the community.[12]  Faced with this outcome, it may be suicidal for the HOA to actively foreclose on its homeowners, even those not paying dues.[13]

Fortunately, the Sale offers a new option for the HOA to pull out of this deadly freefall.  What motivated the Senior Lienholder here to ask for the Trustee's assistance was the absence of

---

[11] The decision to foreclose generally leads to more homes sitting vacant—even after foreclosure—raising health and safety concerns, as well as targets for vandalism and squatting. *See* Creola Johnson, *Fight Blight: Cities Sue to Hold Lenders Responsible for the Rise in Foreclosures and Abandoned Properties*, 2008:3 Utah L. Rev. 1169 (2008).

[12] This effect has been termed the "Broken Windows" theory. *See* Wilson, James Q. and George L. Kelling "Broken Windows: The Police and Neighborhood Safety." *The Atlantic*. March 1982: 29-38.  The "Broken Windows" theory suggests that small, isolated nuisances, if ignored, lead to larger neighborhood problems. For example, if a window is broken and left unrepaired, people soon will conclude that no one is in charge.  Subsequently, more windows will be broken and the sense of community disorder will spread, sending a signal that criminals can do as they wish here.

[13] For a timely and thorough discussion of the challenges facing homeowners associations in Nevada, *See Privatopia in Distress: The Impact of the Foreclosure Crisis on Homeowners' Associations*, Note, 10 Nev. L. J. 561 (2010).

1   any other party to hold responsible for surrendered properties.  From the HOA's perspective, the

2   Sale provides it with quicker repayment of outstanding assessments and a stop to the draining,

3   neighborhood deterioration inflicted by insolvent homeowners, absent lenders, and vacant homes.

### 1.   The Sale Benefits The First Junior Lienholder

5   The Sale will provide maximum benefit to the First Junior Lienholder without

6   jeopardizing its ability to realize the value of its secured claim.  The RPA and HUD, as well as

7   the Broker's marketing efforts and the Hearing, have all been carefully employed by the Trustee

8   to afford the First Junior Lienholder with the same fundamental protections provided to it in a

9   foreclosure sale.  The First Junior Lienholder is further safeguarded against any "fire sale" of the

10  Property because it may credit bid under § 363(k) the full amount of its claim[14] and its lien

    attaches to the Net Proceeds in the same priority to provide adequate protection under § 363(e).[15]

11  Most importantly, the First Junior Lienholder will benefit because the Sale can be

12  finalized more quickly and economically through the bankruptcy court than through the

13  foreclosure process.  Generally, the First Junior Lienholder's best alternatives are to seek relief

14  from the automatic stay and initiate or continue foreclosure proceedings.[16]  These alternatives

15  only further delay a productive transfer of the Property, resulting in continued devaluation and an

16  increased likelihood of damage to the collateral.  By contrast, here, the First Junior Lienholder

17  will not have to pay many of the fees and costs associated with a foreclosure sale, including

18  after-foreclosure expenses like eviction, maintenance, security, rehabilitation, holding costs,

    remarketing, and reselling, which can be considerable even if a foreclosure is uncontested.[17]  The

19

20  [14] See, e.g., In re Sunflower Racing, Inc., 219 B.R. 587, 600 (Bankr. D. Kan. 1998)(ruling § 363(k) grants mortgagee
    rights, analogous to those under state law, to "bid at a foreclosure sale" and "own the property after foreclosure").

21  [15] See In re Gulf States Steel, 285 B.R. 497, 512-513 (Bankr. N.D. Ala. 2002)(§ 363(f)(5) sale that provides secured
    creditors adequate protection and affords all due process rights is equivalent to a non-bankruptcy foreclosure sale).

22  [16] Obtaining relief from stay can give rise to numerous expenses, complications, and delays; these may be further
    compounded by lender liability if foreclosure (post-AB 284) is not carried out in exact accordance with Nevada law.

23

24  [17] **Many studies provide a dollar value associated with foreclosure costs, with the average over $50,000 or
    more per loan.** See Cutts, Amy Crews, and Richard K. Green. *Innovative Servicing Technology: Smart Enough to
    Keep People in Their Houses?* FREDDIE MAC WORKING PAPER No. 04–03. Washington, DC: Freddie Mac

25  (2004)(**estimating lenders' average foreclosure cost to be approximately $58,759 per loan**), *available at*:
    http://www.freddiemac.com/news/pdf/ fmwp_0403_servicing.pdf; *see also* MORTGAGE BANKERS ASS'N, "*Lenders'
    Cost of Foreclosure*" p. 2 (May 2008)(**lenders lose over $50,000, or 30-60% of outstanding loan balance, per**

26  **foreclosure**), *available a*t:  http://www.mbaa.org/files/Advocacy/2008/LendersCostofForeclosure;  *Sheltering
    Neighborhoods from the Subprime Foreclosure Storm*, SPECIAL REPORT BY THE JOINT ECONOMIC COMMITTEE, 1,

27  110th Cong., 1st sess. (Washington: GPO 2007)(**average cost of $78,000 per foreclosure**), *available at*:

28  http://jec.senate.gov/archive/Documents/Reports/subprime11apr2007revised.pdf.

First Junior Lienholder will also avoid the need to be in the chain of title and any liabilities associated with ever being an owner of record. Most importantly, the First Junior Lienholder will receive a higher value from the Sale—providing it with liquidity in less time and at a lower cost—than it would recover without the Trustee's efforts; this obviously inures to its benefit.[18]

### 3.    The Sale Benefits The Unsecured Creditors

The Sale maximizes benefits to unsecured creditors because they will be paid a portion of the § 506(c) Carve-out requested by the Trustee, whereas they otherwise would receive nothing from a foreclosure. *See supra* Section III(E)(2); *infra* Section IV(E). This is because the First Junior Lienholder has a deed of trust on the Property that totals more than the equity in it. Absent payment from the § 506(c) Carve-out, unsecured creditors will receive nothing. By contrast, under the Sale proposed by the Trustee, these creditors will receive a meaningful distribution.[19]

### 4.    The Sale Benefits The Debtor

The Sale free and clear provides maximum benefit to the Debtor for two reasons: (1) orderly surrender of the property and (2) the fresh start envisioned under the Bankruptcy Code.

### *The Sale Brings Finality To The Disposition Of The Real Property*

First, it brings a fair and orderly resolution to the turmoil associated with surrendering the Property, allowing the Debtor a means to consciably extricate himself from this financial burden by taking responsibility for the transfer of ownership and possession of the Property. Filing for chapter 7 bankruptcy protection is a significant first step—it signifies that the Debtor has shifted from the false panacea of mortgage modification to cold acceptance of economic

---

[18] By definition, a secured creditor should do as well in bankruptcy as in foreclosure, and bankruptcy law provides that, under § 506(a) and the best interest test, it must receive at least the value of its collateral—which is generally a judicially determined foreclosure sale value net of liquidation costs. *See* Jonathan Hicks, *Foxes Guarding the Henhouse: 'The Modern Best Interests of Creditors' Test in Chapter 11 Reorganizations*, 5 NEV. L.J. 820, 837-38 (2005).

[19] Earlier this year, another Ninth Circuit bankruptcy court—relying on almost identical reasoning—approved a chapter 7 trustee's motion to sell property free and clear after finding the sale satisfied § 363(b), (f), and was in the best interests of creditors and the estate:

> The evidence shows that the estate has no equity in the Family Compound. CrossHarbor's stalking horse bid of $10,850,000 is not enough to pay the debt secured by CrossHarbor's liens, or the lien of the LeMond Group. Nevertheless, under the terms of the proposed sale the estate will receive at least the $850,000 carve-out in cash from CrossHarbor's stalking horse bid, and possibly more if the sale goes to auction. Without the sale, the evidence shows that CrossHarbor will seek relief from the stay to seek foreclosure against the Family Compound. Samson testified that he cannot stop CrossHarbor, and so if the sale is not approved the estate will receive nothing and the Family Compound will be lost to the estate.

*In re Blixseth*, 2011 WL 1519914, *16 (Bankr. D. Mont. Apr. 20, 2011)(slip copy).

distress.[20]  Helping the Trustee secure, maintain, and transfer his surrendered property to new owners brings the Debtor definitive closure while demanding real accountability in bankruptcy.

### _The Sale Allows For A Fresh Start_

Second, the Sale acknowledges that significant factors can—or already are—impacting the ability of the Debtor to get a fresh start today, even after he elected to surrender his home in bankruptcy.  In Nevada, the Debtor remains on title until ownership is actually transferred—until then, he is responsible for everything that occurs on or to the Property, even if it is vacant.[21]  He also stays liable for all unpaid, post-petition HOA fees, including any deficiency that may remain after the Association receives payment of its nine month "super priority" lien following a foreclosure of the Property.  _See In re Thirteen South v. Summit Village_, 109 Nev. 1218, 866 P.2d 257 (1993)(holding that an HOA covenant is an affirmative obligation that burdens and runs with the land, not an encumbrance extinguished by a free and clear sale).

Therefore, should the Association later decide to aggressively sue the Debtor for this post-petition deficiency, it may do so through a judgment.  _See Hamm v. Arrowcreek Homeowners' Ass'n_, 124 Nev. 290, 183 P.3d 895 (2008)(liability for dues remains as long as one remains on title).  Additionally, any third party injury reasonably connected to the Property may bring suit against the Debtor for post-petition damages if the Debtor is still the title owner at the time of injury.  Since the Debtor may be faced again with collection calls and defending new litigation, the surrendered Property remains a real and continuing obstacle to his fresh start, one which prevents him from obtaining the relief expected from filing a bankruptcy: getting out from under his liability for the Property.

Not only does the Debtor face continuing liability because of the First Junior Lienholder's decision to delay foreclosure, this delay invariably keeps his credit-worthiness trapped in subprime limbo.  While the Debtor expected his bankruptcy to invalidate the credit history he spent years building, he truly believed that the road to recovery post-bankruptcy would be paved if he, going forward, exercised better financial management, coupled with

---

[20] For most debtors, bankruptcy is an unavoidable, last-resort option. _See_ Robert M. Lawless et al., _Did Bankruptcy Reform Fail? An Empirical Study of Consumer Debtors_, 82 AM. BANKR. L.J. 349, 376, 381 (2008)(suggesting that those who file for bankruptcy are seriously in debt and wait until it is absolutely necessary to file before doing so).

[21] Debtors do not realize that even if they indicate that they will surrender their homes in the bankruptcy, they are still technically "owners"—and, therefore, still under a legal duty to maintain the property until it is foreclosed. Additionally, debtors assume that the lender will take reasonable steps to preserve its collateral once they move out.

sacrifice, hard work, and time. *See* Gregory Letter. Alas, what the Debtor did not expect—and what the Code does not intend—is for the cold, dead hand of his discharged debts to reach out from their grave to deliver fresh punishment.[22] *Id.* Yet, this inequitable outcome routinely happens whenever a lender delays foreclosing on a surrendered property until long after the bankruptcy discharge date. The Debtor, who has worked diligently to rebuild his credit post-bankruptcy, has no way to prevent a late foreclosure from undermining his credit and renewed credibility with lenders; all he can do is wait for it to finally appear on his credit report. Likewise, his dream of home ownership is delayed by a late foreclosure, if not denied entirely.[23]

By contrast, approving the Sale minimizes the First Junior Lienholder's continued harm to the Debtor, which is fueled by an absence of finality. It also expedites the Debtor's fresh start, protects his expectations, and reinforces the injunctive integrity of a bankruptcy discharge order.[24]

### 5. Public Policy Supports This Sale

This motion speaks to the fundamental policy debate in bankruptcy law—the balance between providing debtors with a fresh start and limiting losses to creditors. *See Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005). Because bankruptcy's fundamental concern is resolving financial distress, its animating purpose is not to simply mirror a hypothetical creditor's bargain by preserving pre-bankruptcy entitlements in the setting of a collective proceeding.[25] Rather, bankruptcy is a process for constructing a new, only partly

---

[22] The Trustee does not believe—and does not intend to argue here—that the secured creditor's choice to forebear foreclosure violates § 524(a)'s discharge injunction. On this particular point, the Trustee finds persuasive the analysis in *In re Canning*, 442 B.R. 165, 172 (Bankr. D. Me. 2011)(denying debtors' claim for violation of the discharge injunction based on lender's refusal to act in response to debtors' ultimatum to "foreclose or release" real property).

[23] For example, a debtor won't be eligible for a Federal Housing Administration ("FHA") approved loan until two years after his bankruptcy discharge, provided he has re-established good credit (or has chosen not to incur new credit obligations), has demonstrated an ability to manage financial affairs, and three years have passed since the debtor's last foreclosure or the giving of a deed-in-lieu. Thus, while a debtor whose lender is efficient at liquidating the collateral will wait two to three years to get an FHA loan, a debtor whose lender unreasonably delays foreclosure for a year or longer should expect to wait four or five years to qualify. This is true regardless of whether the debtor surrendered the property in the bankruptcy or when he vacated the house. So long as the debtor remains on title, his discharge relief is ineffective; his ability to get a fresh start is hostage to the bank's decision not to foreclose timely.

[24] A fresh start is central to bankruptcy's bargain: it "gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

[25] *See, e.g.,* 11 U.S.C. §§ 507(a) (statutory bankruptcy priorities); 502(b)(2) (disallowing unmatured interest claims); 502(b)(6) (capping lease termination damage claims); 502(b)(7) (capping employment contract termination claims); 510(b) (subordinating certain securities law claims); 510(c) (equitable subordination); 724(a) (subordinating penalties and fines); 724(b) (subordinating certain tax liens); 1114 (special protection for certain retiree benefits).

- 15 -

bargained for post-bankruptcy accommodation of conflicting rights.[26]

In reaching these accommodations, however, bankruptcy must routinely alter parties' rights under otherwise applicable non-bankruptcy law rather than preserve them.[27]  This ability to substitute remedies and alter entitlements is what ultimately encourages markets to accept this legal process to work out problems arising when parties face unmanageable debt burdens. Although this process can be a painful one for all involved, bankruptcy's rules and policy goals encourage an orderly forum to best sort out each creditor's share of losses and return the deleveraged debtor to productivity.

Sadly, the bankruptcy system seems incapable of handling the current home-foreclosure crisis.  Bankruptcy policy cannot force secured creditors to take responsibility for their collateral and act consistently with their contractual right to preserve said collateral.  But encouraging bankruptcy sales may incentivize secured creditors to finally take control of mortgage defaults and decide sooner whether to keep borrowers in their collateral or assume responsibility for its maintenance and possession upon abandonment.  Bankruptcy sales may also encourage these creditors to limit their losses without creating a moral-hazard problem for lenders or borrowers.[28] Foreclosure moratoria, loan modification programs, and legislative changes to the foreclosure process (such as longer notice periods and mandatory mediation), while well-meaning, only increase the "shadow inventory" of properties suspended in various stages of foreclosure; as a result, these maneuvers merely delay the housing market's downward correction.[29]

---

[26] For example, in bankruptcy, a secured creditor's state law rights to foreclose on collateral are subject to stay and modification, so long as adequate protection is provided and the value of collateral securing the claims is preserved. 11 U.S.C. §§ 361-364, 1129(b).

[27] "Bankruptcy law accomplishes these accommodations by manufacturing consent, by deliberately altering nonbankruptcy rights rather than mirroring them, by creating and then exploiting ambiguity over the content of those rights, by capitalizing on inadvertence and inertia, and by foisting Hobson's choices on parties."  Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent In Bankruptcy*, 83 AM. BANKR. L.J. 663, 669 (2009).

[28] Preventing inefficient foreclosures fits into the well-recognized exception to moral hazard for "contagion fires." That is, while it creates a moral hazard for the fire department to rescue people from fires caused by smoking in bed, they rescue in-bed smokers without hesitation, in part because fires can spread and harm third parties, like neighbors.  Foreclosures function like fires, and a rash of foreclosures can destroy property values throughout a neighborhood.  Here, potential moral hazard concerns are minimal compared to the immense third-party costs of foreclosures.

[29] Also, these arguably impinge on lenders' property rights, raising serious constitutional issues of takings and state-law impairment of existing contract obligations that may not come into play when a creditor has its property rights and remedies altered under Congress' bankruptcy power.

Bankruptcy sales employ powers granted to the Trustee under the Code to efficiently liquidate and quickly transfer "property of the estate" to new owners—all in the service of bankruptcy's dual policies of limiting lender losses and providing "good faith" debtors with a fresh start.  These policies, coupled with the Trustee's showing that the Sale is both beneficial and in the best interest of all parties, provide this Court a strong business justification for authorizing this Sale under 363(b).

## C.    The Trustee Is Authorized To Sell Free And Clear Pursuant To 11 U.S.C. § 363(f)

The Bankruptcy Code expressly authorizes a trustee to sell property outside the ordinary course of business "free and clear of any interest in such property of an entity other than the estate" if any one of the five following conditions is met:

(1)  applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

§ 363(f)(1-5).

Section 363(f) is written in the disjunctive; thus, satisfaction of any of the five conditions is sufficient to sell the property free and clear of liens and interests. *See Clear Channel,* 391 B.R. at 25.  The trustee bears the burden to "show that one of the provisions of § 363(f)(1)-(5) is applicable to each lien or interest from which the sale is to be free and clear." *In re Daufuskie Island Props., LLC*, 431 B.R. 626, 637 (Bankr. D. S.C. 2010).  Here, the Trustee can sell the Property free and clear of all liens and interests pursuant to §§ 363(f)(2) and 363(f)(5).

### 1.  This Sale Free And Clear Is Authorized Pursuant To § 363(f)(2)

A bankruptcy trustee may sell property of the estate free and clear of a lien or other interest where the holder of the lien or interest consents. § 363(f)(2).  Courts have ruled that consent may be either express or implied and, to the extent that a secured creditor receives notice and does not file a written objection, such party should be deemed to have consented to a sale of the assets under § 363(f)(2). *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002)(failure to object may constitute consent, if there was adequate notice); *In re Tabone, Inc.,*

175 B.R. 855, 858 (Bankr. D. N.J. 1994)(failure to object to notice of sale or attend hearing deemed consent to sale for purposes of § 363); *In re Elliot,* 94 B.R. 343, 345-46 (Bankr. E.D. Pa. 1988)(implied consent found where bank received notice of the proposed sale and did not file a timely objection); *cf. In re Roberts*, 249 B.R. 152 (Bankr. W.D. Mich. 2000)(holding consent to a particular action requires an unequivocal manifestation of affirmation that cannot be assumed from silence or a failure to object to sale).[30]

Recently, the Bankruptcy Appellate Panel (hereafter "BAP" or "Panel") briefly addressed the role of consent under § 363(f)(2) in a case devoted mainly to affirming that the bankruptcy court's authorization under § 363(f)(5) was a proper and natural extension of the Panel's *Clear Channel* decision. *In re East Airport Development, LLC*, 443 B.R. at 831.  Prior to this appeal, the secured creditor had vigorously opposed the sale motion and filed objections in the bankruptcy case. *Id.*  As in *Roberts*—where the court reasoned that a sale under § 363(f)(2) could only be accomplished if a lienholder consented *in anticipation of* or *during* the bankruptcy—the BAP in *East Airport Development LLC* found that the secured creditor's pre-petition consent under a deed release agreement did not equate to post-petition consent to a sale free and clear, especially when that lienholder unambiguously revoked its pre-petition consent by opposing the motion at the sale hearing.  "A creditor's *express refusal* to consent *ordinarily precludes* a sale under § 363(f)(2)." *Id.* (citing *Morgan v. K.C. Mach. & Tool Co.,* 816 F.2d 238, 241 (6th Cir. 1987))(emphasis added).  The BAP then concluded that the lienholder's vigorous objections to the sale were sufficient to bar a court granting authorization under § 363(f)(2).[31] *Id.*

In addition to express and implied consent, there is another standard—one not addressed in *East Airport Development*, *LLC*, one especially applicable to this case—which evaluates consent under § 363(f)(2) by examining the secured creditor's conduct coupled with §105(a)'s powers and state law equitable doctrines. *See, e.g., In re Colarusso*, 280 B.R. 548, 559-560

---

[30] *Roberts* goes way beyond the Ninth Circuit's requirement that "[h]olders of liens that may be adversely affected are entitled to unambiguous notice and adequate opportunity to reflect and to respond."  *In re Loloee,* 241 B.R. 655 (9th Cir. BAP 1999); *See also In re Metzger*, 346 B.R. 806, 815 (Bankr. N.D. Cal. 2006)(holding § 363 sale void only to the extent that it purported to sell free and clear of an unnoticed creditor's interest).  *Roberts* actually shifts the burden to the trustee to prove consent rather than merely let the court treat consent as a rebuttable presumption deemed true in the absence of a creditor's objection.  *In re Roberts*, 249 B.R. 152, 158 (Bankr. W.D. Mich. 2000).

[31] The BAP in *East Airport Development, LLC* did not rely on *In re Roberts* for the proposition that consent is a separate burden that must be proven, in addition to adequate notice, in cases where lienholders do not object.  Nor did the BAP hold that consent may never be implied by silence or that failure to object can never be deemed consent under § 363(f)(2).  Instead, the BAP only cites *Roberts* as support for the general principle that a creditor's express refusal to consent—affirmatively shown by its unambiguous opposition—will ordinarily preclude a bankruptcy sale.

- 18 -

(Bankr. Mass. 2002), *aff'd*, 295 B.R. 166, 175 (1st Cir. BAP 2003), *aff'd,* 382 F.3d 51, 61 (1st Cir. 2004)(§363(f)(2) was satisfied because the "defendant consented to the sale by her conduct" and "Defendant's actions do constitute a waiver of her rights to object to the sale"); *In re EnvisioNet Computer Servs., Inc*, 275 B.R. 664, 669 (D. Me. 2002)(creditor's failure to timely object to a properly noticed sale resulted in a waiver of its objection); *see also Veltman* v. *Whetzal,* 93 F.3d 517, 521 (8th Cir. 1996)(§ 363(f)(2) satisfied when secured creditor consented to a sale twice post-petition, but later changed its mind and then objected to the sale).  This third standard is sometimes called transformative consent. *See* Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent In Bankruptcy*, 83 AM. BANKR. L.J. 663, 664 (2009)("'Consent' means to give one's permission to a proposal. The existence of 'transformative consent' is a legal conclusion that sufficient permission has been given to justify creation or alteration of legal rights.").  Transformative consent may also be called, for lack of a better term, equitable consent.

Equitable consent arises naturally because bankruptcy "proceedings [are] inherently proceedings in equity," *Local Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934), that apply "principles and rules of equity jurisprudence[.]" *Pepper v. Litton*, 308 U.S. 295, 304 (1939); *see also In re Beaty,* 306 F.3d 914, 922 (9th Cir. 2002)("[A] bankruptcy court is a court of equity and should invoke equitable principles and doctrines, refusing to do so only where their application would be inconsistent with the Bankruptcy Code.").  In bankruptcy cases, this equitable power is derived from 11 U.S.C. § 105(a), which provides: "The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  Still, § 105 "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *In re Saxman*, 325 F.3d 1168, 1175 (9th Cir. 2003)(quoting *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986)).  Instead, §105(a)'s powers supplement other Code provisions and provide additional latitude to a court's interpretation of applicable equitable doctrines. *In re Santos*, 112 B.R. 1001, 1006 (9th Cir. BAP 1990)("Any equitable doctrines must be applied in a manner consistent with the plain language of the rules and the purposes served by those rules and with a mind to the strict construction of the rules consistently followed in the Ninth Circuit").[32]

---

[32] Additionally, since state law generally supplies the rule in bankruptcy, Title 11 courts will look to a state's highest court for guidance before exercising their equitable powers to fashion a remedy.  In Nevada, the Supreme Court has repeatedly said that, unlike some other jurisdictions which try to limit the equitable doctrines, "[W]e have not so limited the power of the courts in this state to seek and do equity."  *Mahban v. MGM Grand Hotels, Inc.,* 100 Nev. 593, 596, 691 P.2d 421, 424 (1984)(citing *Nevada Pub. Emp. Ret. Bd. v. Byrne*, 96 Nev. 276, 607 P.2d 1351 (1980)).

While not from within the Ninth Circuit, *In re Sheryl Lynn Pigg*, 453 B.R. 728 (Bankr. M.D. Tenn. 2011) is a timely decision highly illustrative of the way in which a court can—by locating its equitable authority in the Bankruptcy Code—use a provision like § 363(f)(2) to craft an appropriate remedy from within the confines of Title 11.  In *Pigg*, the debtor sued the bank because homeowners association dues were continuing to accrue in her name. *Id.* at 730.  In her chapter 7 bankruptcy, the debtor surrendered all interest in the property to the bank. *Id.* at 731.  Despite that, the bank never actually foreclosed—the property just sat vacant—and, during that time, the association continued to accrue post-petition unpaid dues, which the debtor continued to be liable for under 11 U.S.C. § 523(a)(16).[33] *Id.*  The debtor eventually filed a lawsuit in order to cut off her liability for the dues, either by having the lender finalize the foreclosure, accept a deed in lieu, or allow a sale. *Id.* at 732.

The *Pigg* court found that revised § 523 "deprives the debtor of a fresh start and thwarts the goals of the entire Bankruptcy Code."[34] *Id.* at 733.  The *Pigg* court also agreed that the bank had taken possession of the property (and so was liable for the accruing association dues). *Id.* However, because it could not force the bank to foreclose, the *Pigg* court set about fashioning a

---

[33] Recent decisions wrestling with this issue have looked at: **The relationship between §§ 523(a)(16) and 521(a)(2)**. *See, e.g., In re Ames*, 447 B.R. 680, 683 (Bankr. Mass. 2011)("The fact that the debtor stated the intent to surrender the condominium unit in accordance with § 521(a)(2)(A) and has acted on that intent…does not alter his status as the title holder of the unit and thus postpetition condominium fees and assessments arising while he remains the record owner of the unit are not dischargeable under § 523(a)(16)")**; Whether a secured creditor can be forced to foreclose and take title**. *See, e.g., In re Canning*, 442 BR 165, 172 (Bankr. D. Me. 2011)("Though the Code provides debtors with a surrender option, it does not force creditors to assume ownership or take possession of collateral")**; The role of state law in determining whether a debtor's obligation to pay homeowners association assessments arose from a pre-petition contract or was a post-petition obligation running with the land**. *See, e.g., In re Foster*, 435 B.R. 650, 657-59, 661 (9th Cir. BAP 2010)(finding that, under Washington State law, the association's dues arose out of a covenant running with the land, and therefore a Chapter 13 "debtor's personal liability for these association dues is an incidence of ownership of his property not affected by the filing of his bankruptcy" so long as the Chapter 13 debtor "maintains his legal, equitable or possessory interest in the property").

[34] The *Pigg* Court reasoned that Congress could not have anticipated the mortgage crisis resulting in lenders, today, stalling foreclosure actions, resulting in the failure of the Code to provide debtors their fresh start:

> Congress' broadening of section 523(a)(16), no doubt the result of some special interest lobbying, could not have foreseen the world and United States financial crisis that crashed Wall Street, sunk the real estate market, and affected, to some degree, almost every American. With the real estate collapse, lenders, who otherwise have the right to do so, are choosing not to foreclose on their collateral leaving homeowners in limbo. In the case of a chapter 7 debtor who has surrendered her home in bankruptcy and been relieved of any personal liability on the mortgage, she cannot truly be given a fresh start because HOA fees are still accumulating until a lender chooses to foreclose. If the lender never forecloses, that homeowner's liability for the HOA fees continues in perpetuity. Congress' broadening of § 523(a)(16) to protect HOAs deprives the debtor of a fresh start, and thwarts the goals of the entire Bankruptcy Code.

*In re Sheryl Lynn Pigg*, 453 B.R. 728, 733 (Bankr. M.D. Tenn. 2011).

remedy that would be in accord with bankruptcy law while respecting the bank's rights. *Id*. at 735. The *Pigg* court expressly found that "the Bank and the HOA have consented to the sale by their inaction." *Id*. at 736. The *Pigg* court then used its equitable powers under the Bankruptcy Code to direct the chapter 7 trustee to sell the property under § 363(f)(2) and distribute the proceeds (after payment of any administrative expenses incurred, including the trustee's commission) in accordance with lien priorities. *Id*.

Here, the Senior Lienholder has expressly consented to the Sale and has requested that the Trustee dispose of its collateral through bankruptcy; § 363(f)(2) is satisfied as to its lien. Additionally, as of the filing of this Motion, the First Junior Lienholder has not raised any objection to the Property being sold in bankruptcy by the Trustee. If, after notice and a hearing, the First Junior Lienholder still does not object to this Motion, it should be deemed to have consented under § 363(f)(2). Should the First Junior Lienholder instead make *East Airport Development, LLC* applicable by vigorously opposing the Sale, this Court may still authorize it based on conduct coupled with 105(a)'s equitable powers and state law doctrines; hence, the First Junior Lienholder's post-bankruptcy actions—including its inaction—may be held against it to satisfy consent and properly find its objections waived. As in *Pigg*, this Court may also rely on equitable consent to fashion a remedy which holds the First Junior Lienholder accountable. As a result, transformative consent provides authority here to approve the Sale under § 363(f)(2).

### 2. *This Sale Free And Clear Is Authorized Pursuant To § 363(f)(5)*

The Ninth Circuit BAP has clearly laid out the requirements for a sale of real property free and clear of liens and interests under § 363(f)(5). *See Clear Channel*, 391 B.R. at 30.

### Clear Channel's Facts And Holding

In *Clear Channel*, the senior lienholder reached an agreement with the chapter 11 trustee to purchase the debtor's real property by way of credit bid, outside of a plan of reorganization, free and clear of any non-consenting, junior lienholders. *Id*. at 31. When the trustee moved to approve the sale under § 363(f)(3) and § 363(f)(5), a junior lienholder objected, asserting § 363(f) was not applicable. *Id*. at 32. The bankruptcy court ultimately approved the sale to the senior lienholder under § 363(f)(5), finding that this section permits a sale free and clear of junior interests in property "whenever a claim can be paid with money." *Id*. at 42.

On appeal, the Bankruptcy Appellate Panel (hereafter "BAP" or "Panel") noted that the wording of §363(f)(5) imposes three requirements to sell free and clear: (i) a proceeding exists or

could be brought; (ii) in which a nondebtor could be compelled to accept a money satisfaction; and (iii) of its interest." *Id.* at 41. Taking up these factors in reverse order, the Panel concluded that a lien constitutes an "interest" for purposes of § 363(f)(5). *Id.* at 42. With respect to the second factor, the Panel reasoned that a qualifying proceeding is one in which a lien or other interest "could be compelled to take less than the value of the claim secured by the interest." *Id.* at 45. Finally, the Panel held that the first factor of § 363(f)(5) "requires that there be, *or that there be the possibility of*, some proceeding, either at law or at equity, in which the nondebtor *could be forced* to accept money in satisfaction of its interest." *Id.* (emphasis added).

The Panel then rejected the trustee's argument that the availability of cramdown under 11 U.S.C. § 1129(b)(2) satisfies the "legal or equitable proceeding" requirement of § 363(f)(5). *Id.* at 46. The BAP stated that it would be "circular reasoning" to sanction "the effect of cramdown without requiring any of section 1129(b)'s substantive and procedural protections." *Id.*; *cf. In re Terrace Chalet Apartments*, 159 B.R. 821. 829-830 (N.D. Ill. 1993)(invoking chapter 11 cramdown). The Panel further suggested that no section of the Bankruptcy Code can satisfy § 363(f)(5) because "[i]f the proceeding authorizing the satisfaction was found elsewhere in the Bankruptcy Code, then an estate would not need § 363(f)(5) at all; it could simply use the other Code provision." *Id.* Accordingly, a trustee may have a very significant evidentiary burden if he is never able to rely on any section of the Bankruptcy Code.

Ultimately, the Panel reversed the bankruptcy court's decision because the bankruptcy court had failed to make the necessary findings. *Id.* at 47. The Panel then remanded the matter to allow the parties to identify a qualifying proceeding under non-bankruptcy law that would enable the trustee to sell the property free and clear of the junior lienholder's interest.[35] *Id.* However, on remand, the issue of applicable non-bankruptcy law was not pursued, and the dispute was resolved by the senior creditor's purchase of the objecting junior lienholder's claim, without further proceedings.[36] Thus, the issue of whether state foreclosure law could supply the

---

[35] Though the BAP remanded the matter, it never waded into the issue of whether state foreclosure law could supply the mechanism or the applicable non-bankruptcy law to allow a sale free and clear. Largely, this resulted from a failure by the chapter 11 trustee and the bankruptcy court to raise it and point the BAP to California foreclosure law.

[36] Shortly after *Clear Channel* was published, the parties settled the case—and the BAP's decision was not vacated. Because of this settlement, any potentially clarifying points that could have been added by either court to mitigate confusion from the BAP's decision are left to academic speculation. *See* Request for Issuance of Notice of Transfer of Claim Pursuant to F.R.B.P. Rule 3001(e)(2), *In re Pw, LLC*, Case No. 06-16059, Dkt. No. 245 (Sept. 4, 2008).

mechanism or the applicable non-bankruptcy law to allow a sale free and clear was never raised or addressed in *Clear Channel*.[37]

### *Clear Channel Adopts The Narrow View Of § 363(f)(5)*

Section § 363(f)(5) presents a conundrum: how should § 363(f)(5) be interpreted by a bankruptcy court so as not to be either "all-powerful" or "so specialized as never to be invoked?" *Clear Channel*, 391 B.R. at 38.  Under an "all powerful" reading, § 363(f)(5) always permits a sale simply by pointing to some theoretical possibility under which a money satisfaction could be compelled.  Because this expansive interpretation makes one wonder why Congress bothered to place any prerequisites on sales free and clear, cases like *Clear Channel* have found ways in logic and the law to set limits and narrow this subsection's scope.  *See*, *e.g.*, *In re Haskell, L.P.*, 321 B.R. 1, 9 (Bankr. D. Mass 2005)(holding mere existence of eminent domain powers insufficient to satisfy § 363(f)(5) absent showing that such mechanism could be exercised by trustee under facts of case); *Terrace Chalet*, 159 B.R. at 827, 829, 830 (requiring the debtor to demonstrate that it can actually cramdown a secured creditor's lien under §1129(b)(2) before allowing a sale under § 363(f)(5) to proceed).

According to *Clear Channel*, an expansive reading is an overly broad construction that "renders the other subsections under § 363(f) mere surplusage." *Clear Channel*, 391 B.R. at 41.  Applying this logic to the statute, the BAP first moved to adopt restricted constructions to prevent overlap unless a plain reading supported an expansive scope.[38]  *Id.* at 40-43.  Next, the Panel concluded that, while a plain reading of "interest" includes liens, § 363(f)(3)'s language would be too expansive if "aggregate value of all liens" merely referred to economic value under § 506(a); likewise, § 363(f)(5) would be too expansive if one could simply point to a hypothetical

---

[37] While the BAP does not identify foreclosure under state law as a mechanism that could compel junior lienholders to take less than their interests are worth, it certainly hints at it.  Specifically, the Trustee finds it notable that *Clear Channel's* analysis of § 363(f)(5) relies heavily on a bankruptcy court decision, *In re Gulf States Steel*, 285 B.R. at 508-509, which looked to Alabama foreclosure law for authority to allow a sale free and clear under § 363(f)(5).  "Ableco has a lien on the Property that is senior in priority to such claims, liens or interests. Thus, the holders thereof would be compelled as a matter of law to release the same in a judicial or non-judicial foreclosure of the senior liens held by Ableco. *See* Ala. Code § 35-10-5." *Id.*  Considering *Clear Channel's* thoroughness, the Trustee finds it difficult to ignore the BAP's choice to keep mentioning *Gulf States Steel*—including citing to it for the cornerstone proposition that § 363(f)(5) requires the existence of a "mechanism" for extinguishing a lien (*Clear Channel*, 391 B.R. at 43)—without ever once questioning, not even in a footnote, that court's application of Alabama foreclosure law.

[38] *See Clear Channel*, 391 B.R. at 40 ("This reading expands § 363(f)(3) too far."); *Id.* ("But another reason…exists to reject such an expansive reading."); *Id.* at 41 ("We believe that Congress intended "interest" to have an expansive scope."); *Id.* at 43 ("[363(f)(5)'s] scope need not be expansive…").

proceeding without also indicating how the result "could be compelled." *Id*. Ultimately, the Panel decided on a narrow interpretation of § 363(f)(5)—one less concerned with limiting hypothetical mechanisms than with requiring a higher burden of proof as to their availability. *Id.* at 43. The Panel laid out the case law supporting this narrow construction as follows:

> Under the view that full payment is not necessary, it is not the amount of the payment that is at issue, but whether a "mechanism exists to address extinguishing the lien or interest without paying such interest in full." *In re Gulf States Steel,* 285 B.R. at 508. Other courts have required a showing of the basis that could be used to compel acceptance of less than full monetary satisfaction. *See, e.g., id.; In re Terrace Chalet Apts.,* 159 B.R. at 829.

*Id.*

Thus, to be in compliance with *Clear Channel*, a trustee must demonstrate two things:

(1)    A mechanism that is capable of hypothetically extinguishing each lien without full payment; and

(2)    How the trustee himself could *actually* use (either directly or indirectly) that identified mechanism to compel the corresponding lienholder to accept less than full payment.

While *Clear Channel* does not reduce the rules from *Gulf States Steel* and *Terrace Chalet* into the simple two-step test presented above, any mathematically unchallenged reader can derive this result from *Clear Channel's* three-part equation: "(1) a proceeding exists or could be brought, in which (2) the nondebtor could be compelled to accept a money satisfaction of (3) its interest." [39] *Id.* at 41. Additionally, any reader looking closely at the examples chosen by the Panel can observe how they illustrate *Clear Channel's* dual criteria approach: a partnership buy-out arrangement, a liquidated damages clause, a damage remedy agreed to in a real estate conveyance—each provides an identifiable mechanism capable of reducing an interest to a claim and each allows parties who have contracted for said mechanism to *actually* use it to compel. *Id.* at 43-44.

Unfortunately, the eloquence of the BAP's "narrow" formulation of § 363(f)(5) has been lost on many readers, who mischaracterize these examples to suggest that the BAP intended the universe of qualifying proceedings under § 363(f)(5) to be quite small. Moreover, this widespread assertion that *Clear Channel* was trying to effectively write § 363(f)(5) out of the

---

[39] Since the third variable is satisfied whenever § 363(f)(5) is applied to a lien, only two elements remain in the test.

Code has forced courts in the Ninth Circuit to make "clarifications" of *Clear Channel* to prevent others from adopting this incorrect reading. *See In re Jolan, Inc.*, 403 B.R. 866 (Bankr. W.D. Wash. 2009); *In re East Airport Development, LLC*, 443 B.R. at 830-831.

### *"Clarifying" Clear Channel's Two-Step Test For Lien Interests*

Picking up where *Clear Channel* left off, the *Jolan* court set out to discuss what types of proceedings could permit a sale under § 363(f)(5) when the sales price is insufficient to satisfy all of the liens. *See Jolan*, 403 B.R. at 866. In *Jolan*, a chapter 7 trustee sought authority to sell the debtor's personal property to the debtor's previous landlord for $25,000. *Id.* at 867. Objections were filed arguing that, under *Clear Channel*, a sale free and clear of liens under § 363(f)(5) could not be authorized over objections by secured parties who would not be paid full value for their claims.[40] *Id.* The *Jolan* court addressed this widespread misconception head-on, noting that the appellees in *Clear Channel* had not argued that any qualifying "legal or equitable proceedings" existed beyond cramdown under § 1129; hence, the BAP had exercised its prerogative to limit its ruling to arguments presented by the parties. *Id.* at 869. As such, the Panel in *Clear Channel* never considered whether there may be other state law "non-contractual mechanisms whereby a lienholder might get less than full payment yet lose the lien." *Id.*

The *Jolan* court then held that the property at issue could be sold at auction free and clear of liens pursuant to § 363(f)(5) because various Washington State and non-Bankruptcy Code statutes provide mechanisms for the release of creditors' liens for less than their full value. *Id.* at 869-70. These mechanisms included: (1) a senior secured party's disposition of collateral under the default remedies provided in Article 9 of Washington's Uniform Commercial Code; (2) a receiver's sale of assets free and clear of liens with the liens attaching to the sale proceeds; (3) the liquidation of a probate estate; (4) a personal or real property tax sale; (5) a federal tax lien sale; and (6) the disposition of real property through "judicial and nonjudicial foreclosures, which operate to clear junior lienholders' interests, with their liens attaching to proceeds in excess of the costs of sale and the obligation or judgment foreclosed." *Id.*

While the *Jolan* court certainly went to great lengths to list hypothetical proceedings under non-bankruptcy law, it never stated that a party seeking to sell assets pursuant to § 363(f)(5) must simply show the existence of some mechanism by which, under any set of facts, a secured

---

[40] These objectors appear to have accepted that liens are interests, satisfying the third prong of *Clear Channel's* test.

creditor may be compelled to accept payment in return for its interest in the property.[41]  Instead, a close reading of *Jolan* shows agreement with *Clear Channel* that it is the moving party's burden (in both cases, the trustee) to present evidence that, under his facts, there exists a mechanism that can be used to extinguish the lienholder's interest in the subject property.[42]  Indeed, the *Jolan* court only granted the trustee authority to sell free and clear after the senior lienholder consented to releasing its lien in the collateral.[43]  *Jolan* therefore accepts a classic premise underlying cases like *Clear Channel and Gulf States Steel*—that where property is encumbered by multiple liens, the trustee generally cannot sell free and clear absent consent from the most senior lien, since presumably no non-bankruptcy legal or equitable proceeding exists whereby the senior lien could be compelled to accept a money satisfaction of its claim for less than the claim's full amount.

Fundamentally, then, *Jolan* stands for the following limited proposition: in circumstances where (a) the senior lienholder consents to the sale and (b) the junior lienholders are undersecured, the trustee can sell the property free and clear of junior liens, as these junior lienholders could be compelled to accept a money satisfaction in a state foreclosure action commenced by the senior lienholder.[44]  Beyond that, *Jolan* simply expounds on the first part of *Clear Channel's* test before finally adopting its view that the mere existence of any mechanism is insufficient to satisfy § 363(f)(5) absent a showing that, under the facts of the case, that mechanism *could actually be*

---

[41] Rather, *Jolan* presents a litany of alternatives to demonstrate that there exist many instances where a sale free and clear under §363(f)(5) would not unduly prejudice objecting junior lienholders.  *Jolan's* intent in doing so is merely to clarify that "narrow" was not meant to limit available proceedings only to those examples given in *Clear Channel*.

[42] "*And were the trustee proposing to sell real property*, judicial and nonjudicial foreclosures in Washington operate to clear junior lienholders' interests, and their liens attach to proceeds in excess of the costs of sale and the obligation or judgment foreclosed." *Jolan*, 403 B.R. at 870 (emphasis added to show trustee restricted by his facts).

[43] Originally, the trustee did not specify which subsection of § 363(f) applied but noted that "there is a dispute among the secured creditors as to who has the higher priority." *See* Trustee's Motion For Sale of Property under Section 363(b), *In re Jolan Inc*., Case No. 09-10411, Dkt. No. 40 at 2 (Bankr. W.D. Wash. Mar. 17, 2009).  At some point, the trustee settled this dispute and found the senior lienholder was Evergreen Bank.  Evergreen Bank then filed an opposition, stating: "[It] does not object to a sale of the debtor's interest in the collateral so long as it is clear that Evergreen does not consent to a stripping of its lien position in the collateral." *See* Supplemental Memorandum re proposed sale of collateral, *Id.*, Dkt. No. 55 at 2 (Bankr. W.D. Wash. Apr. 9, 2009).  In other words, Evergreen consented to a sale of its collateral so long as it would hold a first position security interest in the proceeds after sale.

[44] Other courts in the Ninth Circuit have similarly accepted this limited proposition as being consistent with *Clear Channel*. *See, e.g.*, Order, *In re Black Bull Run Development, LLC.*, No. 10-60593, Dkt. No. 247, *9 (Bankr. D. Mont. Jan. 20, 2011)(finding that *Clear Channel* does not preclude approval of a sale by the trustee under § 363(f)(5) where the senior lienholder has consented under § 363(f)(2) and the estate stands to receive some benefit for helping the senior lienholder "move forward without having to go through State court foreclosure proceedings").

1    *used* by the trustee to extinguish the lienholder's interest.[45]   Thus, like *Clear Channel*, *Jolan* is

2    about raising the evidentiary bar required for the trustee to commence a sale under § 363(f)(5).[46]

3    ### *Courts Adopting The Expansive View Misread Jolan To Attack Clear Channel*

4        Sadly, while *Jolan's* clarification may lead some courts back to the three part analysis

5    required by *Clear Channel*, other courts still continue to misconstrue *Jolan's* holding and apply

6    it as negative precedent contrary to *Clear Channel*. *See, e.g., In re Boston Generating, LLC,* 440

7    B.R. 302, 333 (Bankr. S.D.N.Y. 2010)(involving an argument between senior and junior

8    lienholders over whether § 363 can be utilized to sell substantially all of the debtor's assets

9    before confirmation of a plan). In *Boston Generating*, the senior lienholder took the position that

10   its consent to a sale under § 363(f)(2), although given, was not required, as this sale could be

11   approved without such consent pursuant to § 363(f)(5). *Id.* at 318.   The junior lienholder,

12   meanwhile, refused to consent and objected, contending that *Clear Channel* required the senior

13   lienholder to demonstrate how a sale without the junior lienholder's consent could be compelled

14   under the terms of the intercreditor agreement. *Id.* at 332-333. The court ultimately approved the

15   sale under § 363(f)(5), reaching the correct result despite its own flawed reasoning:

16           This Court declines to follow *Clear Channel.* Section 363(f)(5) does not
             require that the sale price for the property exceed the value of the interests.
17           As recognized in a post-*Clear Channel* decision from a Bankruptcy Court in
             the Ninth Circuit, the existence of judicial and nonjudicial foreclosure and
18           enforcement actions under state law can satisfy section 363(f)(5). *See In re
             Jolan, Inc.,* 403 B.R. 866, 870 (Bankr.W.D.Wash.2009).   Numerous legal
19           and equitable procedures exist by which the Second Lien Lenders could be
             forced to accept less than full payment of the Second Lien Debt.   Thus, the
20           Court finds that because the Second Lien Lenders could be compelled under
             state law to accept general unsecured claims to the extent the sale proceeds
21           are not sufficient to pay their claims in full, section 363(f)(5) is satisfied.

22   *Id.*

---

[45] *See, e.g.,* Memorandum Opinion, *In re Pioneer Village Investments, LLC.,* No. 10-62852, Dkt. No. 110 (Bankr. D. Or. Dec. 3, 2010)(finding §363(f)(5) not satisfied where sale motion cites to *Jolan* as authority but then fails to point to specific proceedings under Oregon law which could actually be used to compel senior lender to suffer a sale of its collateral).

[46] Another case raising the bar is *In re Scott*, Opinion Granting In Part Trustee's Motion To Sell, Case No. 10-69733, Dkt. No. 76, *4 (Bankr. E.D. Mich. June 29, 2011).  In *Scott*, a secured creditor, CitiMortgage, raised *Clear Channel* in opposition to the chapter 7 trustee's position that cramdown satisfies § 363(f)(5) because it could "hypothetically take place, if not in this Chapter 7 case, in either a Chapter 11 or a Chapter 13 case."  While claiming to refrain from subscribing to *Clear Channel*, the court then went on to deny the trustee's motion, ruling that cramdown "fails, if for no other reason than Citi's mortgage, if it has one, is or was on Debtors' principal residence. A principal residence is not subject to stripping or cram down in either chapter pursuant to 11 U.S.C. § 1322(b)(2) and 11 U.S.C. § 1129(b) respectively.  In this Court's view, the hypothetical proceeding needs, at the very least, to be legally possible."

In declining to follow *Clear Channel*, the *Boston Generating* court adopted broad reasoning which made § 363(f)(5) superfluous. It did this by misstating *Clear Channel's* holding and incorrectly reading *Jolan* to say that the mere existence of a proceeding—without the court delving into whether the debtor could actually use that mechanism to compel the junior lienholder to accept a money satisfaction of its interest—was enough. Had it read *Jolan* closer, the *Boston Generating* court could have applied *Jolan's* limited proposition to reach the same result, finding that the debtor there had met its burden under § 363(f)(5) when the senior lienholder—who had the power to foreclose—consented to the debtor's use of its remedy in a bankruptcy sale. Thus, not only was this sale approvable under *Clear Channel*, there was no reason to ever hold otherwise.

Nevertheless, courts which look to *Jolan*'s framework to approve sales still continue to dismiss *Clear Channel* by describing themselves as leaning more toward an expansive view of § 363(f)(5).[47] On the surface, it would appear that these courts simply treat § 363(f)(5) as a one-part test easily satisfied whenever the trustee can point to a mechanism. Dig deeper, though, and, more often than not, what these courts are really doing is using *Jolan* as a time-saving tool—one which lets them approve a desired sale without asking tough questions or doing heavy lifting.[48]

### *The First Prong Of Clear Channel's Test Is Satisfied Here*

In various proceedings under Nevada and non-bankruptcy law, secured creditors may have their liens removed for less than full value. These including many of the same proceedings cited in *Jolan*: receivership sales,[49] real property tax sales,[50] liquidations under probate,[51] and

---

[47] *See, e.g.*, Memorandum Regarding Sale, *In re Wrangell Seafoods, Inc.*, No. 09-00012, Dkt. 116 *2 (Bankr. D. Alaska Mar. 9, 2009)(finding sale could be made free and clear of objecting junior lienholders because state law allows their security interests to be eliminated in a foreclosure sale)("The BAP in *Clear Channel* takes a very narrow view of what can occur upon sales made pursuant to 11 U.S.C. § 363(f). I respect the scholarship and reasoning displayed in the opinion. However, I disagree with the BAP's conclusion. I tend to take a more liberal view of the statute. Alaska law permits the sale of real and personal property interests by foreclosure. Under state law, secondary security interests can be eliminated at foreclosure sales. The sale is justified under § 363(f)(1) and (5).").

[48] *Cf. Boston Generating* to *Clear Channel*, with only the latter not shying away from voicing concerns that rushed sales under manufactured emergencies—especially § 363 sales made by credit bid to buy substantially all of the debtor's assets outside the plan process—could deny some creditors due process or preclude meaningful input and appellate review of sale orders. *See also In re Gulf Coast Oil Corp.*, 404 B.R. 407, 421-427 (Bankr. S.D. Tex. 2009) (citing to *Clear Channel* as support for the proposition that secured creditors of a debtor in chapter 11 should not get the benefits of § 363 sales without having to comply with the plan process under which these benefits are obtained).

[49] *See* NRS § 78.700.

[50] *See* NRS §§ 361.585, 361.595, 361.610.

[51] *See* NRS §§ 148.130, 148.140.

federal tax lien sales.[52]  Additionally, the most prevalent mechanism for selling secured property in Nevada is judicial and nonjudicial foreclosure.[53]  Still, while each of these mechanisms, under the right circumstances, could theoretically satisfy the first prong of the test under *Clear Channel*, the Trustee has based his argument here on the fact that Nevada provides homeowners associations with "super priority" liens.  *See* NRS §§ 116.3116 and 116.310312.  Associations in Nevada can use this "super priority" status to foreclose ahead of, and without the consent of, a consensual first mortgage.  As such, any lien junior to an association's lien could be compelled, in a foreclosure proceeding, to take less than the value of a claim secured by it.[54]

### *The Second Prong Of Clear Channel's Test Is Satisfied Here*

A homeowners association has a perpetual lien against the properties in its community. NRS § 116.3116(4)("Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required."). NRS § 116.3116(1) provides for any penalties, fees, charges, late charges, fines and interest to be enforced as assessments, with the full amount of these assessments granted a bifurcated lien against the property. The "super priority" portion of this bifurcated lien primes the first mortgage on the property to the extent that those assessments would have become due in the nine months prior to enforcement of the lien. NRS § 116.3116(2).  As such, this "super priority" lien allows an association to either wait for the first mortgage to foreclose or else initiate, by itself or through its agent or attorney, an action to foreclose on its "super priority" lien. NRS § 116.31164(1).  If an association does elect to foreclose, the person conducting the sale will apply "the proceeds of the sale for the following purposes in the following order: (1) The reasonable expenses of sale; (2) The reasonable expenses of securing possession before sale, holding, maintaining, and preparing the unit for sale, including payment of taxes and other governmental charges, premiums on hazard and liability insurance, and, to the extent provided for by the declaration, reasonable attorney's fees and other legal expenses incurred by the association; (3) Satisfaction of the association's lien; (4) Satisfaction in the order of priority of any subordinate claim of record; and (5) Remittance of any excess to the unit's owner." NRS § 116.31164(3)(c).

---

[52] *See* 26 U.S.C. §§ 6335, 6339(c), and 6342.

[53] *See* NRS §§ 40.430 (judicial foreclosure), 107.080 (nonjudicial foreclosure).

[54] *See* Daniel Goldmintz, *Lien Priorities: The Defects of Limiting the "Super Priority" for Common Interest Communities*, 33:2 Cardozo L. Rev. 101-129 (2011).

Here, the Association has a perfected "super priority" lien against the Property, and it has consented to the Sale by the Trustee. *See* Ex. 1.  The Association provided its consent after determining that it would be more expedient and cost-effective to have the Trustee foreclose its "super priority" lien in bankruptcy court than initiate its own action under state law or wait for the first mortgage to foreclose.[55]  Essentially, the Association has decided to use of its remedy— the mechanism granted to it by state law to compel junior liens to accept a satisfaction of their interests—and has entered into a mutually beneficial agency relationship with the Trustee.[56]  The Trustee offers it this convenience in exchange for compensation he can share with the Estate.[57]

Moreover, this arrangement, which is little more than the Association giving its consent under § 363(f)(2), is fundamentally no different from any other case—including *Clear Channel* and *Jolan*—where a senior lienholder agrees to allow a § 363(f) sale of its collateral by a trustee. It is also nearly identical, by analogy, to the position a trustee finds himself in after he avoids the senior lien and preserves it for the benefit of the estate; the trustee may now sell the property. *See, e.g., In re Ellis*, 2011 WL 61378 at *3 (Bankr. D. Idaho Jan. 7, 2011)("Trustee avoided the lender's lien, and that lien has been preserved for the estate…Standing in the shoes of Suntrust, Trustee can consent to a sale even if the amount received will not pay off the obligation secured by the deed of trust.").  Standing in the HOA's shoes via consent, the Trustee now has the ability to actually use NRS §§ 116.3116 to force a sale free and clear of junior interests, compelling all of the Lienholders to accept a money satisfaction of their liens.  The Trustee therefore meets his burden under § 363(f)(5) by presenting this Court with more than just the existence of a

---

[55] Arguably the biggest advantage of a bankruptcy sale is title insurance.  Because title insurance is not generally available to a foreclosing party who takes ownership through a trustee's sale, HOAs have found it nearly impossible to sell property following foreclosure, as subsequent purchasers cannot obtain title insurance unless the HOA also conducts a quiet title action.  A quiet title action is a judicial proceeding where a court is petitioned to "quiet" any claims associated with previous owners who lost the subject property.  If successful, insurable title can be obtained by the HOA; however, this result will require costly and time-consuming litigation.  By comparison, an HOA can have its lien quickly and efficiently satisfied—and provide a subsequent purchaser with the ability to get title insurance—by consenting to the Trustee's use of its state law remedy to carry out a free and clear bankruptcy sale.

[56] In essence, the Association and the Trustee are merely replicating in bankruptcy the same agency relationship that the Association already has, outside of bankruptcy, with collection agencies under state law.  The definition of collection agency includes an agent who "performs or offers to perform any act associated with the foreclosure of a lien pursuant to NRS 116-31162 to 116.31168, inclusive." NRS 649.020(3)(a); *see also Hamm v. Arrowcreek Homeowners' Ass'n*, 124 Nev. 290, 299, 183 P.3d 895, 902 (2008)("An agency relationship results when one person possesses the contractual right to control another's manner of performing the duties for which he or she was hired.").

[57] Interestingly, a collection agency instructed by an HOA to foreclose will bill the HOA for fees, services, and other costs associated with foreclosure; the HOA will be reimbursed later by adding those charges onto its lien.  As such, it may be that some of the § 506(c) Carve-out for Trustee's 363 Commission may also be justified by reference to these same statutory provisions allowing payment of fees and charges to an agent providing foreclosure services.

hypothetical proceeding that could theoretically extinguish junior interests; the Trustee has demonstrated how the Senior Lienholder's consent actually allows him to use said mechanism.

Hence, with regard to the First Junior Lienholder, the Trustee may rely on § 363(f)(5) for authority to strip its lien from the Property and reattach its claim to the Net Proceeds of the Sale.

### The Third Prong Of Clear Channel's Test Is Satisfied Here

All secured creditors' liens are interests which can be satisfied though payment of claims.

### The Trustee Has Satisfied All Three Prongs Of Clear Channel's Test

The Trustee has satisfied the increased evidentiary burden under *Clear Channel's* "narrow" interpretation of § 363(f)(5) and is authorized to carry out this Sale under that section.

### 3.  The Trustee Reserves The Right To Argue §§ 363(f)(1), 363(f)(3) And 363(f)(4)

At this time, the Trustee is unaware of any bona fide dispute respecting any lien recorded or unrecorded.[58]  Still, the Trustee reserves all rights to augment this Motion should a bona fide dispute be discovered prior to or after the hearing on this Motion.  In addition, to the extent that a basis for approval under §§ 363(f)(1)[59] or (f)(3)[60] is brought to the Trustee's attention, the Trustee reserves the right to argue these sections as well.

### D.    The Court Should Approve Implementation Of The Motion, RPA, And HUD

Pursuant to §§ 363(b)(1) and 105(a), this Court may authorize the implementation of sale terms and procedures.  *In re Mama's Original Foods, Inc.,* 234 B.R. 500, 503 (Bankr. C.D. Cal. 1999)("In selling property of the estate, a trustee is required to market the property in the manner that is customary for property of the kind at issue.").  The sale terms and procedures detailed in the Motion, RPA, and HUD—which correspond closely to the manner of sale customarily recognized in the home resale marketplace—ensure that that the Property generates the highest value for the Estate.  This customary manner includes authorizing the escrow company to disburse monies from the Purchase Price in accordance with the HUD, including paying the Broker Commission, and all taxes, expenses, and costs associated with completing the Sale, as

---

[58]  Generally, a lien subject to bona fide dispute under § 363(f)(4) could not complete a foreclosure proceeding successfully and so would not try. Here, the First Junior Lienholder has already moved to foreclose on the Property.

[59]  *Clear Channel* effectively treats a sale under § 363(f)(1) no different from a sale under § 363(b) alone; it merely lets a debtor accomplish in bankruptcy what he could have done had he not filed. *See Clear Channel*, 391 B.R. at 37.

[60]  Under *Clear Channel*, this Sale fails under §363(f)(3) because its price is less than the total amount of all liens.

well as disbursing the Net Proceeds directly to the Trustee, to be held in trust pending the Order on Proceeds. Additionally, this proposed format acts as the functional equivalent of a "short sale", one reinforced by crucial protections and practices already found under Nevada foreclosure law.

First, this Sale design respects Nevada's one-action rule, which requires secured creditors seeking to enforce a debt secured by real property to recover against the property first by foreclosure.[61] Second, it provides secured creditors with a right to credit bid their interests in the property under § 363(k), similar to protections found outside of bankruptcy.[62] Third, it provides for a distribution of proceeds like that dictated under foreclosure law, with all costs and expenses of the Sale, including the Broker Commission and § 506(c) Carve-out, allotted priority and paid ahead of secured creditors.[63] Fourth, the Order on Proceeds insures that claims are sufficiently investigated and transfer of ownership is made consistent with Nevada law.[64] Fifth, the Sale will almost certainly fetch a higher price than a foreclosure,[65] and has already generated a higher price than the previously submitted Short Sale Offer. Taken together, these terms and procedures allow the Trustee to expose and sell the Property for maximum value, more quickly and at lower cost—while simultaneously providing the Lienholders with Nevada's legal and equitable

---

[61] *See* NRS § 40.430 "One Action Rule": *". . . there may be but one action for the recovery of any debt, or for the enforcement of any right secured by a mortgage or other lien upon real estate . . . ."* (emphasis added).

[62] *See* NRS §§ 107.030, Covenant 6; 107.080.

[63] *See* NRS § 40.462(a): "Payment of the reasonable expenses of taking possession, maintaining, protecting and leasing the property, the costs and fees of the foreclosure sale, including reasonable trustee's fees, applicable taxes and the cost of title insurance and, to the extent provided in the legally enforceable terms of the mortgage or lien, any advances, reasonable attorney's fees and other legal expenses incurred by the foreclosing creditor and the person conducting the foreclosure sale."

[64] Nevada courts have stressed the importance of substantially complying with NRS 107.080 when exercising the power of sale under the statute. *See Berilo v. HSBC Mortg. Corp., USA*, No. 2:09-cv-02353-RLH-PAL, 2010 WL 2667218, *3 (D. Nev. 2010); *Chavez v. California Reconveyance Co.*, Case No. 2:10-cv-00325-RLH-LRL, 2010 WL 2545006, *2 (D. Nev. 2010); *Evans v. Aurora Loan Services, LLC*, Case No. No. 2:09-cv-02401-RLH-LRL, 2010 WL 2545639, *3 (D. Nev. 2010). This is because Nevada courts still seek to provide a remedy where there is misconduct which could lead to the wrong party foreclosing, selling a home, and retaining funds not entitled or owed to it. *See Leyva v. National Default Servicing Corp.*, 127 Nev. ___, ___, 255 P.3d 1275, 1281 (2011) (concluding that to exercise power of sale, creditor should be able to produce documents necessary to demonstrate it is entitled to foreclose); *see also In re Veal*, 449 B.R. 542 (9th Cir. BAP 2011)(holding a debtor objecting to a creditor's proof of claim has the right to know the identity of the "person entitled to enforce" the mortgage note).

[65] Compare these results to non-judicial foreclosure sales, which are: (1) not well advertised compared with private sales; (2) the defaulted homeowner is still in possession of the property so inspection is not possible; (3) defaulted properties are often not well maintained, which further pushes down foreclosure sale prices; (4) any bidder at the foreclosure sale will likely have to bid over the outstanding mortgage amount in order to win because the foreclosing lender will place a credit bid for the outstanding amount of the mortgage; and (5) the homeowner can, in some states (not Nevada), redeem the property after the foreclosure sale by simply paying the foreclosure sale price.

protections—than these same secured creditors would likely realize were they to foreclose instead.[66]

### E.    The Court Should Approve Employment Of The Broker *Nunc Pro Tunc* And Grant Payment Of The Broker Commission

Real estate brokers are "professionals" for purposes of 11 U.S.C. § 327 of the Bankruptcy Code and their employment must be approved by the court. Sec. 327(a); Fed. R. Bank. P. 2014(a).  Professionals generally cannot recover fees for services rendered to the estate unless those services have been previously authorized by a court order. *In re Shirley*, 134 B.R. 940, 943-44 (9th Cir. BAP 1992).  However, courts also possess the equitable power to approve retroactively a professional's valuable but unauthorized services. *In re Atkins*, 69 F.3d 970, 974 (9th Cir.1995).  "Professionals seeking retroactive approval must satisfy two requirements: they must (1) satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that their services benefitted the bankrupt estate in a significant manner." *Id.*  In addition, a professional seeking retroactive authorization must satisfy the criteria for employment pursuant to § 327 and make a full disclosure of disinterestedness in a *nunc pro tunc* application. *Id.* at 976.

Here, the Debtor originally hired the Broker to carry out a "short sale" of the Property. The Trustee only recently signed a Listing Agreement with the Broker, which includes payment of a Broker Commission equal to six percent (6%) of the Purchase Price (to be split with Purchaser's agent). *See* Ex. 6.  Thereafter, the Broker wasted no time in bringing the Trustee numerous offers, and her considerable efforts quickly produced the accepted Purchase Price; this occurred before the Trustee could file an application to authorize her employment and notice up a hearing.  In order not to lose the Purchaser, the Trustee decided it would be more efficient to include the Broker's application in the Motion, as the Broker had already provided the Estate with valuable but unauthorized services at that point.  The Broker's work, however, is not done

---

[66] **The Trustee's sale process has been guided by the advice given to a fellow trustee in this circuit**: "If the Trustee wants to pursue a sale process and conduct a fair auction intended to find the highest and best offer for the [Property], the sale procedures should be as a bona fide auction — with procedures as transparent and as flexible as possible.  Specifically, the Trustee should formulate a proposal that encourages—and potentially rewards—all bidders to proffer their highest and best offers." *In re Blixseth*, 2010 WL 716198, *10 (Bankr. D. Mont. Feb. 23, 2010)(first sale motion denied without prejudice); *In re Blixseth*, __B.R.__2011 WL 1519914 at 14 (Bankr. D. Mont. Apr. 20, 2011)(resubmitted sale motion approved).  **In regard to that first sale motion, the judge also found:** "Given the inadequacies of the Trustee's proposed bidding procedures and the notice of such procedures, the Court need not address the parties' arguments under § 363(f) and whether *Clear Channel* applies." *Id.*  **Accordingly, the Trustee has labored to make sure that his Motion does not suffer from similar procedural infirmities which may prevent this Court from addressing the merits of his arguments under § 363(f) and *Clear Channel*.**

1  yet, and, going forward, the Broker is still needed to assist the Trustee in closing this Sale. The

2  Broker remains disinterested and her continued employment is in the best interest of the Estate.

3  *See* Affidavit of Broker, Ex. 8. The Trustee therefore requests, that the Broker be employed

4  *nunc pro tunc* on behalf of the Estate.[67]    Similarly, the requested Broker Commission is

5  reasonable, necessary, and beneficial, and its payment should be approved by the Court as well.[68]

6  **F.    The Court Should Approve And Grant Payment Of The § 506(c) Carve-out**

7  Bankruptcy Code §§ 326(a) and 330(a)(1) guide bankruptcy courts in their determination

8  of the amount of compensation to be awarded to a trustee. *In re Jenkins*, 130 F.3d 1335 (9th Cir.

9  1997); *In re Roderick Timber Co.*, 185 B.R. 601 (9th Cir. BAP 1995). Compensation awarded to

10  a trustee under § 330(a) must be in the form of a commission (*i.e.,* a percentage of monies

11  disbursed by the trustee to parties in interest) calculated in accordance with § 326. Sec. 330(a)(7).

12  While § 326(a) caps a trustee's fees, courts may adjust this ceiling downward if the extent and

13  value of the trustee's services are unreasonable. *In re B&B Autotransfusion Services, Inc.,* 443

   B.R. 543 (Bankr. D. Idaho 2011); *See also In re Virissimo,* 354 B.R. 284 (Bankr. D. Nev. 2006).

14  Courts have a great deal of discretion to determine a reasonable commission. *In re Pruitt*,

15  319 B.R. 636, 638 (Bankr. S.D. Cal. 2004). Some courts rely, at least in part, on the so-called

16  *Johnson* factors.[69] *See, e.g., In re McCombs*, 436 BR 421, 426-427 (Bankr. S.D. Tex. 2010)

17  (applying the *Johnson* factors to reduce trustee's interim compensation from the statutory

   maximum). Other courts hold that time records, the statutory commission formula of § 326, and

18

19  [67] "The Bank contends that no benefit was conferred on it by the sale of the property. The Bank was prepared to foreclose in state court at the time of the filing of the petition. However, the Bank's ability to pursue a state foreclosure

20  sale does not mean that [the realtor's] actions conferred no benefit on the Bank." *In re Anderson,* 66 B.R. 97, 99 (9th Cir. BAP 1986)(cited by *In re Debbie Reynolds Hotel & Casino, Inc.,* 255 F.3d 1061, 1069 (9th Cir. 2001)).

21  [68] Alternatively, the Court may—without giving the Trustee a license to sidestep the requirements of §§ 327(a) and 330(a)—allow the Broker Commission to be paid through a second, separate carve-out under § 506(c). *See, e.g. In*

22  *re Anderson*, 66 B.R. 97, 99-100 (9th Cir. BAP 1986)(internal citations omitted):

23  We disavow decisions which limit Section 506(c) expenses to the amount of the foreclosure cost saved by the lienholder such as *In re Codesco* and *In re Truitt*. Such a limitation stems

24  from a fundamental misreading of both the statute and its legislative history. No such limitation is contained in the wording of the statute. The statute imposes only three limitations

25  on the expenses that can be recovered from a secured party. The expenses must be necessary and reasonable and are limited to the extent of the benefit to the secured party. For the reasons

26  given above, we hold that a commission to a third real estate broker is of benefit to a secured party. It is not necessary that a secured party consent to such an expense.

27  [69] In *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir. 1975), the Ninth Circuit set forth 12 factors, taken from *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), that a court may use to determine

28  reasonable attorney's fees. The Ninth Circuit has adapted these factors to evaluate trustee compensation as well. *See, e.g., In re Fin. Corp. of Am.,* 114 B.R. 221, 223 (9th Cir. BAP 1990), *aff'd* 945 F.2d 689 (9th Cir. 1991).

"other relevant factors" should be considered in determining reasonable compensation for a trustee. *See, e.g., In re McKinney,* 383 B.R. 490, 493-494 (Bankr. N.D. Cal. 2008). One Ninth Circuit court has even simplified and reframed the analysis in *McCombs* and *McKinney*, ruling recently that because "trustee compensation is within the sound discretion of the court, the central inquiry becomes whether or not the trustee administered the estate *efficiently*." *See* Memorandum Decision Denying Debtors' Objection To Trustee's Fees, *In Re Lashbrook*, Case No. 09-00484-HAR, Dkt. No. 184, *4 (Bankr. D. Alaska June 3, 2011)(emphasis in original).

Additionally, where a court finds that a trustee is not entitled to maximum compensation under § 326(a), the trustee may still be reimbursed for his services and expenses as a surcharge pursuant to § 506(c). *See* § 506(c); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000). This is because courts have long recognized that expenses of sale and of preparation for sale are recoverable by a trustee. *See In re Marino*, 794 F.2d 1367, 1370 (9th Cir. 1986); *In re Anderson*, 66 B.R. 97, 99 (9th Cir. BAP 1986)("We read the Code to provide for payment of the trustee's direct costs of sale out of the proceeds of the sale before distribution to the secured creditors."). Under § 506(c), the trustee seeking recovery must establish that the expenses he incurred were (1) reasonable, (2) necessary, and (3) provided a benefit to the secured creditor, or that the secured creditor caused or consented to the expense. *In re Compton Impressions Ltd.*, 217 F.3d 1256, 1262 (9th Cir. 2000); *In re Cascade Hydraulics & Utility Svc., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987). The trustee must also show a "concrete" and "quantifiable" benefit. *In re Debbie Reynolds Hotel & Casino, Inc*., 255 F.3d 1061, 1068 (9th Cir. 2001). Once these burdens are met, § 506(c) authorizes payment of the surcharge proceeds directly to the trustee who provided quantifiable benefits to the secured collateral. *Id*.

Here, the administration of this Property qualifies under § 506(c) as a reasonable and necessary cost and expense of preserving and disposing of the Property, for the benefit of the Lienholders. The Trustee also submits that a § 506(c) surcharge is more appropriate under these facts than seeking payment under § 330(a), as Trustee's § 363 Compensation is more like a claim for reimbursement of identifiable costs and services benefiting Lienholders than a fee award paid by the Estate for performance of his duties. Still, whether the Trustee's fees are awarded under §§ 506(c) or 330(a), § 326(a) is the logical starting point. *See In re McKinney,* 383 B.R. at 496.

The Trustee therefore requests a § 506(c) Carve-out in the amount of $9,250, which equals the statutory maximum trustee's commission under § 326(a) for a Sale at the Purchase

Price. [70]  Of course, the Trustee will first attempt to negotiate the § 506(c) Carve-out for his services with the Lienholders.[71]  However, in the event that the Lienholders do not ultimately consent to the § 506(c) Carve-out for Trustee's § 363 Compensation, the Trustee may surcharge his $9,250 commission against the Net Proceeds.[72]  This $9,250 surcharge (which is generous considering that the First Junior Lienholder estimated its "Cost of Sale" to be $12,400) will be paid directly to the Trustee for services performed, and the Trustee will promptly make a gift of half of the § 506(c) Carve-out (no less than $4,625) to the Estate, to be disbursed to unsecured creditors.[73]  This carve-out from reimbursed expenses provides for a meaningful distribution.

Accordingly, the Trustee requests the Court grant authorization, pursuant to § 506(c), to surcharge directly against the Net Proceeds all necessary and reasonable expenses incurred by the Trustee and the Estate in connection with a Sale of the Property, including but not limited to

---

[70] "Given the constricted real estate market and noting that the purchaser of the properties might well have walked away if there had been delay in consummating the sale, the Trustee's efforts were by no means perfunctory. He acted swiftly and competently to close the sales of these properties and by doing so, ensured that certain undisputed secured claims were paid. His timely actions also prevented mortgage interest, insurance payments, and property taxes from accruing, thereby preserving the value of the properties prior to their sales and fulfilling his fiduciary duties to the secured creditors. These facts, taken as a whole, argue in favor of awarding the Trustee the maximum amount of compensation allowed under Section 326(a)." *In re McCombs*, 436 BR 444-445 (internal finding of fact nos. omitted).

[71] Historically, bankruptcy courts disapprove of § 363(f) sales as an alternative to state court foreclosure where sales will only benefit secured creditors and the trustee. To overcome this, the trustee will often seek to negotiate a carve-out (a consensual agreement by the secured party to pay some portion of its lien proceeds to unsecured creditors). *Cf. In re Pauline*, 119 B.R. 727, 728 (9th Cir. BAP 1990) to *In re Bolden*, 327 B.R. 657, 668 (Bankr. C. D. Cal. 2005).

[72] The Ninth Circuit has not yet addressed whether a trustee's statutory compensation may be recovered under § 506(c). *See In re Choo*, 273 B.R. 608, 613 (9th Cir. BAP 2002)(declining to address whether the value of the trustee's labor can be reimbursed under § 506(c) where the trustee's actions benefited the secured creditor). However, it has held that § 506(c) authorizes the party that provided the benefit to the secured creditor to *directly* recover for its work from the secured collateral.  *See In re Debbie Reynolds Hotel & Casino, Inc.*, 255 at 1067-1068 (where the basis for the surcharge was the work of the debtor's attorneys, counsel had the right to be reimbursed directly from the surcharge proceeds). Thus, *Debbie Reynolds* suggests the trustee's commission can be recovered.

[73] **The concept of gifting a part of one's distribution priority has been upheld in the chapter 7 context; this is primarily because the absolute priority rule has no application in a chapter 7 case.** *See In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993); *cf. In re DBSD North America, Inc.*, 634 F.3d 79 (2nd Cir. 2011)(abrogating certain gifting practices as violations of the absolute priority rule in the context of a chapter 11 plan).  **SPM Mfg. is also consistent with the Ninth Circuit's conclusion that § 506(c) recoveries do not belong to the estate and do not fall within the priority scheme of the Bankruptcy Code**. *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 at 1067-1068. **Additionally, to the extent, if any, that this Court disagrees with the Trustee's reliance on *SPM Mfg*.** [*cf. In re Warren*, 2011 WL 3299819 *5, n. 4 (9th Cir. BAP 2011)(unpublished)("Regardless, this construction of SPM Mfg. is patently inapposite to the facts presented here.")], **this Court may still allow the Trustee's transfer to unsecured creditors (under *Debbie Reynolds*) by construing any gift from his § 506(c) commission recovery as an independent obligation of the Trustee**. *See, e.g., Clear Channel*, 391 B.R. at 47, n. 29 ("Inasmuch as we construe the Carve-Out Amount as an independent obligation of DB, and not as a transfer of its property rights in its collateral, this is not a case in which a secured creditor has allowed its collateral to be used by the estate pursuant to agreement, and thus none of the implications of such a practice on the absolute priority rule are raised").

Trustee's § 363 Compensation.  If no Lienholder objects to Trustee's § 363 Compensation as proposed in the Motion, the Trustee will receive direct payment of the § 506(c) Carve-out from the Net Proceeds—in an amount equal to his computed maximum commission under § 326(a)—based upon the same arguments outlined in *McCombs*.  *See In re McCombs*, 436 B.R. at 440-441. Likewise, the Estate should be deemed entitled to its award at that moment as well, with unsecured creditors guaranteed one half of Trustee's § 363 Compensation, regardless of how the Court subsequently distributes the rest of the Net Proceeds to the Lienholders.

Finally, in the event that a Lienholder does come forward and object to the basis or amount of the § 506(c) Carve-out, the Trustee is confident that he has satisfactorily demonstrated, in accordance with *Compton Impressions Ltd*., that any and all expenses of Sale incurred were (1) reasonable, (2) necessary, and (3) provided a benefit to the Lienholder or the Lienholder caused or consented to the expense.  As such, while the Trustee does not object to this Court incorporating a *Johnson*-type analysis to determine the exact amount of compensation to award him, he does not believe it is necessary.[74]

## G.    Purchaser Should Be Deemed A Good-Faith Purchaser Pursuant To § 363(m)

"The choice of whether to make a finding of 'good faith' as part of the initial sale process belongs, in this circuit, to the bankruptcy court.  Because findings of 'good faith' made at the time of the sale may be premature because they are made before the really interesting facts emerge, the Ninth Circuit does not require that a finding of "good faith" be made at the time of sale and has rejected the Third Circuit's contrary rule." *In re Thomas*, 287 B.R. 782, 785 (BAP 9th Cir. 2002).  Nevertheless, the trustee has the burden to establish an evidentiary record if he requests such a finding in the sale motion. *In re M Capital Corp.*, 290 B.R. 743, 747 (9th Cir. BAP 2003)("What was implicit in *Thomas*, and which we now make explicit, is that in such proceedings, the proponent of section 363(m) good faith has the burden of proof.").  The purpose of this finding is to facilitate the operation of § 363(m) of the Bankruptcy Code, which provides

---

[74] *Cf. In re McCombs*, 436 B.R. at 443-444, where the bankruptcy court, under a *Johnson*-type analysis, concluded that the trustee performed appropriately but still reduced his interim fee application to less than the statutory minimum.  The bankruptcy court reasoned that—absent success on appeal from that court's previous ruling against the trustee as to the validity of H.D.S.'s lien—there would be no proceeds for distribution to unsecured creditors; hence, the bankruptcy court felt that the trustee had only achieved a partially successful result and should only be partially compensated.  Incidentally, on October 4, 2011—roughly a year after the bankruptcy court's original ruling validating H.D.S.'s lien—this same trustee prevailed on appeal to the Fifth Circuit Court of Appeals; thus, most of the proceeds claimed by H.D.S. will now be available for distribution by the trustee to unsecured creditors. *See In re McCombs*, 659 F.3d. 509 (5th Cir. 2011).  In light of this fully successful final result, it is not yet clear if the bankruptcy court will reconsider its prior reduction and award the trustee his maximum commission under § 326(a).

a safe harbor for purchasers of a debtor's property when the purchase is made in "good faith." Sec. 363(m). Accordingly, without a proper "good faith" finding under section 363(m), there is no safe harbor to shield the sale order from appellate review and appellate remedies. *Id.* at 752.

In this Motion, the Trustee has introduced evidence genuinely probative of "good faith," including showing that the optimal value of the Property will be realized by the Sale and that the Sale is the product of extensive, arms-length negotiation between the Trustee and the Purchaser. The Trustee submits that he has met his burden of proof by creating a well-developed factual record from which this Court may make "good faith" findings; he therefore asks this Court to find the Purchaser entitled to all protections afforded a good-faith purchaser under § 363(m).

**H.     The Court Should Waive The 14 Day Stay Required By Bankruptcy Rule 6004(h)**

Rule 6004(h) of the Federal Rules of Bankruptcy Procedure provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Trustee respectfully requests that the Court waive the provisions of this Bankruptcy Rule and provide that any order entered on the Motion shall take effect immediately upon entry. It would be in the best interests of Lienholders and the Estate to conclude the Sale as expeditiously as possible.

## V.  CONCLUSION

Allowing bankruptcy sales by the Trustee is not a magic-bullet solution—but it is a quick, fair, efficient, and administrable response that may help stabilize the Las Vegas housing market and prevent the deadweight social/economic losses of foreclosure. Bankruptcy sales directly target inefficiencies of foreclosure that destroy investor value (for example, "shadow inventory", "toxic title", and misaligned servicer incentives) and reduce lender backlogs so debtors' properties pass more quickly to new owners at today's higher prices. Bankruptcy sales also let debtors who surrender their homes save face, find closure, and earn their fresh start via cooperation with the Trustee; this mitigates damage to the collateral and to neighbors without encouraging others to engage in the moral hazard of strategic default. Most importantly, bankruptcy sales maximize lenders' recoveries and preserve the value of their collateral in a rapidly diminishing market, all without the associated liabilities and carrying costs of ownership.

Here, the Trustee is adapting the legal tools available to him to meet the challenge of the

foreclosure crisis affecting the Estate.  As the Trustee sees it, this crisis presents an opportunity, one which he has a duty to explore on behalf of the Estate.  While the Bankruptcy Code does not require the Trustee to creatively leverage his liquidation powers to provide secured creditors with foreclosure relief at a lower cost per unit, it does not forbid it either, provided the Trustee satisfies the requirements to approve a sale under §§ 363(b) and (f).  Assuming these are met, the Trustee is free to place his services at the disposal of a senior secured creditor—consistent with his duties and powers—so long as his actions will unlock value for general unsecured creditors.

The Trustee has demonstrated that this Sale is proper under the Bankruptcy Code, is in the best interests of all parties, is designed to provide a meaningful benefit to the Estate, and will further important public policy goals; therefore, the Trustee asks this Court to approve the Sale.[75]

**WHEREFORE**, based on the foregoing, the Trustee respectfully prays for an Order:

(1)     Authorizing the Sale free and clear of all interests and liens—with all interests and liens attaching to the Net Proceeds remaining after payment out of escrow of the Broker Commission, taxes, fees, and any other ordinary costs of Sale—pursuant to §§ 363(b), (f), 105, and 506(c) of the Bankruptcy Code and 2002 and 6004 of the Bankruptcy Rules;

(2)     Approving the Sale on the same terms as the RPA, HUD, and the Motion;

(3)     Approving Employment of the Broker *Nunc Pro Tunc*;

(4)     Approving the Broker Commission and the §506(c) Carve-out;

(5)     Finding the Purchaser is a good-faith purchaser under § 363(m);

(6)     Waiving the 14 Day Stay required by Bankruptcy Rule 6004(h);

(7)     Granting such other and further relief as this Court deems just and proper.

DATED this 13th day of January, 2012.          **U.S. BANKRUPTCY TRUSTEE**

By: */s/ David A. Rosenberg*

David A. Rosenberg, Trustee

---

[75] "This Court simply agrees with the Bankruptcy Court that there was something of value belonging to the estate that should have been sold as part of the trustee's duty to maximize the value of the estate."  *In re Cloobeck*, Case No. 2:10-cv-01278-GMN-PAL, 2011 WL 2550622 *5 (D. Nev. June 23, 2011)(dismissing appeal of sale order in Bankruptcy Case No. BK-S-05-10179-BAM after finding that the Bankruptcy Court did not err in determining that there existed something of value—whether it be a wholly valid or somewhat defective claim—for the trustee to sell).